**In re ZYPREXA INJUNCTION**
No. 07–CV–0504.
MDL No. 1596.

United States District Court,
E.D. New York.

Feb. 13, 2007.

Pepper Hamilton, LLP, Philadelphia, PA by Sean P. Fahey, Nina M. Gussack, George A. Lehner, Andrew R. Rogoff, McCarter & English, New York, N.Y., by Samuel J. Abate, for petitioner Eli Lilly & Company.

Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, NJ, by Alan C. Milstein, for respondents Alliance for Human

Research Protection, David Cohen, Vera Sharav.

Ted Chabasinski, Berkeley, CA, for respondents Judi Chamberlin, Robert Whitaker, MindFreedom Int'l.

Electronic Frontier Foundation, San Francisco, CA, by Fred Von Lohmann, for respondent John Doe.

Koob & Magoolaghan, New York, N.Y., by Alexander A. Reinert, Edward W.

Hayes, P.C., New York, N.Y., for respondent David Egilman.

John McKay, Anchorage, AK, for respondents James Gottstein, Terri Gottstein.

Laura Ziegler, Montpelier, VT, pro se.

## MEMORANDUM, FINAL JUDGMENT, ORDER & INJUNTION

WEINSTEIN, Senior District Judge.

### Table of Contents

I. INTRODUCTION ....................................................391

II. FACTS ..........................................................397
 A. The Litigation ..............................................397
 B. Protective Order, Case Management Order No. 3 ...............397
 C. Agreement by Egilman to be Bound by Protective Order .......399
 D. Conspiracy of Berenson, Egilman, and Gottstein ............400
 E. Subpoenas Issued by Gottstein ..............................401
 F. Response to the Subpoenas ..................................402
 G. Discharge of Egilman by Lanier .............................403
 H. Dissemination of Documents Pursuant to Conspiracy .........403
 1. *Acts by Conspirators* ...............................403
 2. *Protectable Distributed Documents* ..................404
 I. Attempts by Special Master Woodin to Retrieve Documents ....404
 J. Publication by N.Y. Times ..................................405
 K. Formal Court Intervention ..................................405
 1. *Argument Before Magistrate Judge Mann* ..............405
 2. *Temporary Restraining Order by Judge Cogan* .........405
 3. *Order to Show Cause for Deposition of Egilman by Judge Weinstein* ..........................................406
 4. *Evasive Actions of Enjoined Persons* ................406
 5. *Preliminary Injunction by Judge Cogan* ..............407
 6. *Hearing on Permanent Injunction By Judge Weinstein* .408
 7. *Invitation to Berenson to Appear by Judge Weinstein* .408
 a) Invitation ....................................408
 b) Response ......................................411

III. LAW ...........................................................412
 A. Public Right of Access to Documents Produced in Discovery ..412
 B. Protective Orders ..........................................413
 1. *Generally* ..........................................413
 2. *Rule 26(c)* .........................................414
 a) Generally .....................................414
 b) Subsection 7 ..................................415
 3. *Umbrella Protective Orders* .........................416
 4. *First Amendment Implications of Protective Orders* ...416
 C. Court Authority to Enforce Orders ..........................417
 1. *Generally* ..........................................417
 2. *National Scope* .....................................418
 D. Injunctions ................................................418
 1. *Generally* ..........................................418
 2. *Persons Bound* ......................................418
 3. *Enjoining Dissemination of Stolen Protected Documents* .419

 4. *Content Neutral* ............................................ 420

IV. APPLICATION OF LAW TO FACTS ........................................ 421
 A. The Documents are Properly Protected Under CMO–3 ................... 421
 1. *CMO–3 is a Valid Umbrella Protective Order* ...................... 421
 2. *Documents Contain Information Protectable by Rule 26(c) and CMO–3* ....................................................... 421
 B. Court has Power to Order Return of Stolen Documents ................... 422
 C. Restrictions on Dissemination Do Not Violate First Amendment Rights ..... 423
 1. *CMO–3's Restriction on Dissemination of Confidential Documents Does Not Implicate First Amendment Rights* ...................... 423
 2. *The Injunction's Restriction on Dissemination Does Not Impinge on First Amendment Rights* ................................... 423
 D. Enjoining Persons Who Refuse to Return the Documents is Necessary to Prevent Irreparable Harm to Lilly ................................ 424
 E. Enjoining Persons Who Returned the Documents is Not Necessary to Prevent Irreparable Harm to Lilly .................................. 425
 F. Websites Should Not Be Enjoined ................................... 426
 G. All Named Persons are Bound by the Injunction ....................... 426
 H. Persons Bound ................................................. 427
 1. *Recipients of Documents* ....................................... 427
 2. *Amelia Desanto* ............................................. 427
 3. *N.Y. Times, National Public Radio and Snighdha Prakash* ........... 427
 4. *Berenson* ................................................... 428
 5. *Gottstein and Egilman* ........................................ 428
 6. *Websites* .................................................... 428
 7. *Persons Who Have Not Returned the Documents* ................... 428
 8. *Persons Restrained* .......................................... 428

V. FINDINGS OF FACT AND LAW ......................................... 429
 A. Embodied in this Memorandum ..................................... 429
 B. Irreparable Harm to Lilly ......................................... 429
 C. Lack of Appreciable Harm to Those Bound ........................... 429
 D. Conclusion .................................................... 429

VI. CONCLUSION ...................................................... 429

VII. STAY ............................................................ 429

VIII. INJUNCTION ...................................................... 429

## I. Introduction

This case raises intriguing questions of when it is appropriate to conduct aspects of civil litigation in secrecy, and of what are appropriate limits on civil disobedience by newspaper reporters, forensic experts, and attorneys.

Over the past two and a half years, some thirty thousand related personal injury suits have been before this court as part of a large multidistrict litigation, and in state courts. People suffering from schizophrenia were prescribed the anti-psychotic drug Zyprexa distributed by defendant, Eli Lilly & Company ("Lilly"). Plaintiffs allege that as a result of inadequate warnings by Lilly they became obese and suffered from diabetes.

The court ordered internal documents of Lilly sealed on consent of the parties so that discovery could be expedited and the individual cases promptly settled or otherwise disposed of on their merits. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2004 WL 3520247 (E.D.N.Y. Aug. 9, 2004) ("Case Management Order

No. 3" or "CMO–3") (hereinafter "protective order"); *see also* Fed.R.Civ.P. 26(c)(7) ("the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . . that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way"); *S.E.C. v. TheStreet.com,* 273 F.3d 222, 229 (2d Cir.2001) ("protective orders issued under Rule 26(c) serve the vital function of securing the just, speedy, and inexpensive determination of civil disputes by encouraging full disclosure of all evidence that might conceivably be relevant") (quotation omitted); Parts III.B and IV.A, *infra.*

Almost all of the cases have now been settled. Millions of documents obtained from Lilly by the court-appointed Plaintiffs' Steering Committees I and II ("PSC") have been made available to all plaintiffs' attorneys in pending federal and state cases. *See In re Zyprexa Prods. Liab. Litig.,* 467 F.Supp.2d 256, 263–64 (E.D.N.Y.2006) ("All materials obtained by PSC I and PSC II in pretrial discovery have been ordered to be made available to all plaintiffs, state and federal."). A large number of documents supplied by Lilly are subject to CMO–3; they are stamped, "Confidential—Subject to Protective Order." Other documents supplied by plaintiffs' counsel involving medical records of individual plaintiffs have been sealed.

A New York Times reporter, Alex Berenson, was aware of the protective order. He discussed with a plaintiffs' expert, Dr. David Egilman, means of escaping the order's restrictions and obtaining protected documents in the expert's possession, *see* Part II.D, *infra,* 400–01 even though Egilman had agreed in writing to be bound by the order. *See* Part II.C, *infra.*

Both Berenson and Egilman were cognizant of the fact that paragraph 14 of CMO–3 took account of the possibility that the protected documents could be subpoenaed by courts or executive agencies. So Berenson provided Egilman with the name of an Alaska attorney, James Gottstein, unconnected to the instant litigation, who might be willing to employ a pretense to subpoena the documents and help disseminate them in violation of the protective order. *See* Part II.D, *infra.*

To carry out the scheme for obtaining and disseminating the protected documents, Gottstein intervened in a state case in Alaska wholly unrelated to Zyprexa. In that case, he then subpoenaed from Egilman confidential documents he knew to be under the protective order which bore no relevance to the Alaska litigation. The subpoenaed documents were sent by Egilman to Gottstein pursuant to an expedited amended subpoena about which Lilly was deliberately kept in the dark so that it would be unable to make a timely objection. *See* Part II.E, *infra.* Gottstein immediately sent the confidential documents on to Berenson and others. *See* Parts II.E and II.H.1, *infra.*

None of the three conspirators, Berenson, Egilman, and Gottstein, sought a lifting or modification of the protective order, despite the declassification procedures provided for in paragraph 9 of CMO–3. *See In re Zyprexa,* No. 04–MD–1596, 2004 WL 3520247, at *5.

Intending that they be published extensively, Gottstein distributed the sealed documents to various organizations and individuals. No distribution to newspapers other than the New York Times was made because of Berenson's explicit warning to his co-conspirators that if the Times was not given "an exclusive" on the story, it would not publish anything at all about the documents. *See* Part II.H.1, *infra.*

Almost at once, the New York Times published excerpts from, and summaries

of, the protected documents in a series of lead articles under Berenson's byline. *See, e.g.,* Alex Berenson, *Eli Lilly Said to Play Down Risk of Top Pill,* N.Y. Times, Dec. 17, 2006, at A1; Alex Berenson, *Drug Files Show Maker Promoted Unapproved Use,* N.Y. Times, Dec. 18, 2006, at A1; Alex Berenson, *Disparity Emerges in Lilly Data on Schizophrenia Drug,* N.Y. Times, Dec. 21, 2006, at A1; *see also* Part II.J, *infra.*

Upon being informed of the breach, the court ordered Gottstein to retrieve the documents and return them to the court-appointed Special Master for Discovery. *See In re Zyprexa Prods. Liab. Litig.,* No. 04–MD–1596, 2006 WL 3877528 (E.D.N.Y. Dec. 19, 2006). *See* Parts II.I and II.K.2, *infra.*

Learning that some of the individuals to whom the conspirators had sent the documents had refused to return them and were attempting widespread dissemination, the court issued a preliminary injunction. It enjoined individuals and organizations who had received the documents from Gottstein—except for Berenson; Snighda Prakash of National Public Radio; and congressional staffers Steve Cha and Amelia Desanto (none of whom had been included by Lilly among those from whom it sought return)—from further disseminating them.

The injunction also ordered specified websites not to publish the documents. *See In re* Zyprexa Prods. Liab. Litig., No. 04–MD–1596, 2007 WL 27117 (E.D.N.Y. Jan. 4, 2007); Parts II.K.5 and II.K.6, infra. The documents may possibly be available on other websites. Their gist can be obtained from stories in the press. See, e.g., Alex Berenson, Eli Lilly Said to Play Down Risk of Top Pill, N.Y. Times, Dec. 17, 2006, at A1; Alex Berenson, Drug Files Show Maker Promoted Unapproved Use, N.Y. Times, Dec. 18, 2006, at A1; Editorial, Playing Down the Risks of a

Drug, N.Y. Times, Dec. 19, 2006; Julie Creswell, Court Orders Lawyer to Return Documents About an Eli Lilly Drug, N.Y. Times, Dec. 20, 2006; Alex Berenson, Disparity Emerges in Lilly Data on Schizophrenia Drug, N.Y. Times, Dec. 21, 2006, at A1.

A final injunction is now being issued against two of the conspirators—Egilman and Gottstein—and others who have not returned the documents they obtained from Gottstein; some of these individuals are mentioned in the court's prior orders. *See* Parts IV.D and IV.H, *infra.*

No newspaper or website is directed to do anything or to refrain from doing anything. *See* Parts IV.F, IV.H.4, and IV.H.7, *infra.* No person is enjoined from expressing an opinion or speaking or writing about the documents. *See* Part VII, *infra.*

A perplexing issue is presented by Lilly's request for an injunction against websites to which the conspirators sent the documents or which might have been used for further dissemination by those to whom the documents were originally sent. *See* Part IV.F, *infra.* The internet, with its almost infinitely complex worldwide web of strands and nodes, is a major modern tool of free speech and freedom both here and abroad. Its reach extends as far as, and perhaps exceeds, that of newspapers and other traditional media. The law is rightly hesitant about allowing government—including the courts—to inhibit and restrict the use of such modern instruments of communication. *See* U.S. Const. amend. I. *Cf.* Jeffrey S. Klein and Nicholas J. Pappas, *When a Private Sector Employer Fires Worker for Blogging,* N.Y. L.J., Feb. 5, 2007, at 3 (pointing out that with over 60 million blogs in existence—a blog being a type of online diary posted to a website—whistleblowing via the internet, on and off business and government prem-

ises, is becoming increasingly common). *See* Note, Protecting the New Media: *Application of the Journalist's Privilege to Bloggers,* 120 Harv. L. Rev. 996 (2007); Michael Russo, *Are Bloggers Representatives of the News Media Under the Freedom of Information Act?,* 40 Colum. J. L. & Soc. Probs. 225 (2006).

Irresponsible people may exercise their own right and opportunity to speak in a manner abusive and constrictive of the rights of others on the internet, in the press, and in other fora. Those whose rights have been abused by the conspirators in violation of the court's protective order include Lilly and tens of thousands of plaintiffs and their attorneys who depended upon CMO–3 and sealing orders of the court to effectively prosecute this important litigation without unnecessary breach of the parties' privacy. It is significant that both the PSC and Lilly support the issuance of the injunction now being issued.

Problems with restrictions by authorities on dissemination of knowledge are not new. They trace back to the Garden of Eden and Socrates' Athens. Most recently they were manifested when people physically disrupted a meeting at Columbia University, preventing speakers from exercising an opportunity to convey their views in an academic setting on a controversial matter. Columbia's President, Lee C. Bollinger, himself a student of free speech, remarked:

> [T]he disruption of that event constituted a serious breach of faith against an academic community built on the freedom to think, speak, debate, and disagree.... [E]very idea poses a risk of action, for good or bad. But what is hard to learn and hard to live by is the single idea that words are the better way in which to work through conflict and danger. This is certainly true for

universities, but also for healthy, free societies....

See Paul Hond, Fighting Words, Columbia, Winter 2006–07, p. 13, 16 (sidebar). Notably, in the Columbia University case, the disrupters were sought out for discipline to prevent future assaults on the freedoms of others. Id.

■ Orders for sealing of documents are designed to permit litigants and the courts to examine a party's internal records, which may include embarrassing personal medical information, or valuable business secrets and commercial data, without unnecessarily exposing them to the public's and competitors' view. *See* Fed.R.Civ.P. 26(c)(7); Parts III.B and IV.A, *infra. Cf. Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson,* 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (holding compelled disclosure of organization's membership list unconstitutional given "inviolability of privacy in group association").

Such protective orders take account of the public's interest in seeing the documents. After balancing the public's right to know and the parties' privacy rights, should the documents sealed by an order such as CMO–3 be found not to warrant continued protection, the order can be modified. *See, e.g., In re Agent Orange Prod. Liab. Litig.,* 104 F.R.D. 559, 572 (E.D.N.Y.1985) (declassifying documents upon a showing "that the need for disclosure outweighs the need for further protection"), *aff'd* 821 F.2d 139 (2d Cir.1987). On motion of a party—or of a non-party—who can demonstrate a need to know, sealed documents may be unsealed pursuant to general policy and the terms of the protective order itself. *See* CMO–3 at ¶¶ 9, 16; Part IV.A, *infra; see also In re Agent Orange Prod. Liab. Litig.,* 821 F.2d 139, 145 (2d Cir.1987) ("It is undisputed that a district court retains the power to

modify or lift protective orders that it has entered."); Monograph, Individual Justice in Mass Tort Litigation, 66–72 (1995); Aaron Twerski, et al., *Secrecy and the Civil Justice System,* 9 J. of L. & Pol'y, 51, 51–107 (2000); Note, *Secrecy in Civil Trials: Some Tentative Views,* 9 J. of L. & Pol'y, 53 (2000); Catherine Wimberly et al., *Secrecy in Law and Science,* 23 Cardozo L.Rev. 1 (2001).

■ Conspirators in the instant case who deliberately thwarted a federal court's power to effectively conduct civil litigation under the rule of law, as well as those in concert with them, should be enjoined to deter further violations of this and other courts' orders. *See* Part IV.D, *infra.* In a democracy it is important to craft any injunction as narrowly as possible so that in protecting essential court processes free speech is not unnecessarily restricted. *See* Parts IV.EF, *infra; Cf., e.g.,* Ronald L. Goldfarb, The Contempt Power, 3 (1963) ("The summary and comparatively unlimited exercise of the [contempt] power compounds the danger to individual freedom which its mere existence implies."). *But cf. id.* at 89 (finding a "sound reason" to use contempt power to prevent dissemination by the media of evidence which will be used at trial because of adverse impact on the right to a fair trial).

Here, an expert hired by plaintiffs agreed in writing not to distribute documents sealed by court order. *See* Part II.C, *infra.* He was given access to those documents so that he could assist plaintiffs—people suffering from serious disabilities, mental and physical—in pressing their civil suit against defendant, a major pharmaceutical company. The litigation resulted in an enormous cache of documents made available, subject to CMO–3, to plaintiffs and courts—state and federal—across the country. Tens of thousands of cases have been settled based on these documents with the assistance of all the

states and the federal government. *See In re Zyprexa Prods. Liab. Litig.,* No. 04–MD–1596, 2006 WL 3501263, at *1 (E.D.N.Y. Dec. 4, 2006) ("In compliance with this court's instructions ... all fifty states as well as the federal government have resolved their Medicare and Medicaid liens."); *In re Zyprexa Prods. Liab.* Litig., 451 F.Supp.2d 458 (E.D.N.Y.2006) (Memorandum Order & Judgment Regarding Liens and Disbursement Procedures).

Egilman, in violation of his legal obligations, and in conspiracy with a reporter, Berenson, and an attorney unconnected to the litigation, Gottstein, deliberately violated this court's protective order and published sealed documents, intending that they be widely distributed. *See* Part II.D, *infra.* Conspirators Egilman and Gottstein took particular pains to deny Lilly an opportunity to prevent the breach; they made the documents public before Lilly could move to preclude their release, after they had in effect assured Lilly that it had time to protect itself in court before any release would occur. Egilman, in violation of his obligations under CMO–3, did not inform Lilly about a second subpoena procured by Gottstein that contained an accelerated production date.

It is not necessary now to decide whether in the long run the public was better served by this conspiracy to flout CMO–3 than by seeking direct and open revelation through amendment of the court's protective order. Even if one believes, as apparently did the conspirators, that their ends justified their means, courts may not ignore such illegal conduct without dangerously attenuating their power to conduct necessary litigation effectively on behalf of all the people. Such unprincipled revelation of sealed documents seriously compromises the ability of litigants to speak and reveal information candidly to each other;

these illegalities impede private and peaceful resolution of disputes.

This is not a case of a government employee, whistleblower, protestor, or juror who faces the difficult choice of "conform[ing his] behavior to the official 'law' while protesting that the law was 'wrong' ... or ... conform[ing] to [his] interpretation" of the law, absorbing whatever legal sanctions are a consequence of the choice. Robert M. Cover, *The Supreme Court, 1982 Term, Foreword: Nomos and Narrative,* 97 Harv. L.Rev. 4, 47 (1983); *see also, e.g.,* Mark Juergensmeyer, *Gandhi vs. Terrorism,* Daedalus, 30 (Winter 2007); Note, *Considering Jury "Nullification": When May and Should a Jury Reject the Law to Do Justice,* 30 Am.Crim. L.Rev. 239, 254 (1993) ("There is ... a deep and profound sense of many Americans that they have the duty to revolt in large and small ways. This is our ultimate protection against tyranny and injustice. Nullification is one of the peaceful barricades of freedom."). For here, the "law," i.e. the protective order, contained an explicit means of escape for those who believed they had a reasonable justification for not complying; the court reserved the power to modify and declassify sealed documents in the public interest. *See* CMO–3 at ¶¶ 9, 16. In any event, the whistleblower or concerned citizen "defense" should be raised during possible contempt, rather than injunction, stages of this proceeding.

Nor is this a case of a newspaper obtaining, with clean hands, documents provided to it by government employees, whistleblowers, or protestors. *See Smith v. Daily Mail Publ'g Co.,* 443 U.S. 97, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) ("[I]f a newspaper *lawfully obtains* truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need ... of the highest order.") (emphasis supplied). It

is unlike *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (hereinafter *"Pentagon Papers"*). In the *Pentagon Papers* case, there was no suggestion that the documents were purloined at the New York Times' or Washington Post's instigation. Here, a reporter was deeply involved in the effort to illegally obtain the documents. *See* Part II.D, *infra.* Affirmatively inducing the stealing of documents is treated differently from passively accepting stolen documents of public importance for dissemination. *See* III.D.3, *infra.* But see *Bartnicki v. Vopper,* 532 U.S. 514, 528–29, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) (noting that the issue has been left open). The New York Times itself appears to recognize the distinction. *See* The New York Times, *Ethical Journalism: A Handbook of Values and Practices for the News and Editorial Departments,* 9 (Sept.2004) ("Staff members must obey the law in pursuit of news. They may not break into buildings, homes, apartments, or offices. They may not purloin data, documents or other property, including such electronic property as databases and e-mail or voice mail messages. They may not tap telephones, invade computer files or otherwise eavesdrop electronically on news sources. In short, they may not commit illegal acts of any sort."). *But see* Parts II.D. and II. K.7(b), *infra* (noting Berenson's and the Times' position in the instant case).

In the United States the media is, in effect, the fourth branch of government. It enables the people to knowledgeably exercise their sovereignty. But neither members of the media, nor of any other branch of our government, are authorized to violate court orders. *See Dietemann v. Time, Inc.,* 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment has never been construed to accord newsmen immunity from torts or crimes committed dur-

ing the course of newsgathering."). *Cf. Pentagon Papers*, 403 U.S. at 733, 91 S.Ct. 2140 (White, J. concurring) ("Prior restraints require an unusually heavy justification under the First Amendment; but failure by the Government to justify prior restraints does not measure its constitutional entitlement to a conviction for criminal publication.").

At this point in the litigation there is no need to measure the actions of the conspirators against the ethics rules for journalists, forensic experts, or lawyers. Holmes' punitive view of the law prevails when a specific order of the court is deliberately flouted. *See, e.g.,* John C. Goldberg & Benjamin C. Zipursky, *Seeing Tort Law from the Internal Point of View: Holmes and Hart on Legal Duties*, 75 Ford. L.Rev. 1563 (2006) (discussing "morality," Holmes' "bad man" rule, and Hart's "internalization" view). It is enough to find that three individuals—Berenson, Egilman, and Gottstein—conspired to obtain and publish documents in knowing violation of a court order not to do so, and that they executed the conspiracy using other people as their agents in crime. *See* Parts II.D–II.H, *infra.*

The injunction requires the return of the protected documents. *See* Parts IV.B and VIII, *infra.* It is limited to individuals who participated in the conspiracy or aided the conspirators. *See* Parts II.D–II.F, II.H, and VIII, *supra.* No one is restricted from discussion of documents already revealed.

To extend the reach of the injunction further might involve the court in attempting to control a constantly expanding universe of those who might have, or will have, access by reason of the original breach. That such an amplified injunction could be enforced effectively is doubtful. Even if enforcement were possible, on policy grounds the risk of unlimited inhibitions on free speech should be avoided when

practicable. *See People of N.Y. v. Operation Rescue Nat'l,* 80 F.3d 64, 70 (2d Cir. 1996) ("in exercising its equitable powers, a court 'cannot lawfully enjoin the world at large'") *(quoting* Judge Learned Hand in *Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 832 (2d Cir.1930)).

## II. Facts

### A. The Litigation

Litigation against Eli Lilly & Co. for injuries allegedly caused by the use of the anti-psychotic drug Zyprexa was initiated in this court in March 2004. *See Benjamin v. Eli Lily & Co.,* Docket No. 04–CV–00893. Many thousands of other cases were then transferred to this court from federal district courts throughout the United States pursuant to an order of the Judicial Panel on Multidistrict Litigation. See Letter from Multidistrict Litigation Panel to Clerk of the Eastern District of New York, No. 04–MD–1596 (Apr. 14, 2004). In addition, there are pending in state courts a considerable number of related cases. See *In re Zyprexa Prods. Liab. Litig.,* No. 04–MD–1596, 2007 WL 160923 (E.D.N.Y. Jan. 18, 2007) ("Memorandum on Cooperation Between Federal and State Judges").

### B. Protective Order, Case Management Order No. 3

To facilitate prompt discovery in these cases, a protective order agreed to and submitted by the parties was issued in August 2004 pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. *See In re Zyprexa Prods. Liab. Litig.,* No. 04–MD–1596, 2004 WL 3520247, *1 (E.D.N.Y. Aug. 9, 2004) (stating purposes of protective order are "[t]o expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect confidential material, and ensure that protection is afforded only

to material so entitled . . ."). Preventing disclosures of documents served the added purpose of protecting a vulnerable plaintiff patient population and avoiding prejudice of potential jurors in any jury trial. *See* Tr. of Hr'g on Application to Issue CMO–3 (July 2, 2004) (magistrate judge Chrein: "material that might be misunderstood by the lay reader . . . might do some harm or prejudge a case that is still pending"). CMO–3 was signed by both the district judge and magistrate judge.

The protective order permits parties to designate as "confidential" materials produced in discovery that the producing party believes in good faith are properly protected under Rule 26(c)(7) of the Federal Rules of Civil Procedure. CMO–3 at ¶ 3. All confidential documents are required to be stamped, "Zyprexa MDL 1596: Confidential–Subject to Protective Order." *Id.* at ¶ 4(b). Once a document is so marked, it "shall be used by the receiving party solely for the prosecution or defense of this Litigation, to the extent reasonably necessary to accomplish the purpose for which disclosure is made." *Id.* at ¶ 2.

Except with the prior written consent of the producing party, or in circumstances described in paragraphs 6 and 14 of CMO–3, "no [c]onfidential [d]iscovery [m]aterials, or any portion thereof, may be disclosed to any person." *Id.* at ¶ 5. Parties are permitted to share confidential materials with "outside consultants or outside experts retained for the purpose of assisting counsel in the Litigation." *Id.* at ¶ 6(i). An expert to whom disclosure is made must "sign, prior to such disclosure, a copy of the Endorsement of Protective Order, attached as Exhibit A" to CMO–3. *Id.* at ¶ 6(m).

Should a court or administrative agency subpoena the confidential discovery materials, CMO–3 provides a specific procedure for the subpoenaed person to follow:

[T]he person to whom the subpoena . . . is directed shall promptly notify the designating party in writing of all of the following: (1) the discovery materials that are requested for production in the subpoena; (2) the date on which compliance with the subpoena is requested; (3) the location at which compliance with the subpoena is requested; (4) the identity of the party serving the subpoena; and (5) the case name, jurisdiction and index . . . number or other designation identifying the litigation . . . in which the subpoena . . . has been issued. *In no event shall confidential documents be produced prior to the receipt of written notice by the designating party and a reasonable opportunity to object.* Furthermore, the person receiving the subpoena or other process shall cooperate with the producing party in any proceeding relating thereto.

CMO–3 at ¶ 14 (emphasis supplied).

Paragraph 6 of CMO–3 describes thirteen situations, apart from the issuance of a subpoena, where confidential documents may be disclosed to listed persons. When the person receiving the confidential materials is a customer or competitor of the producing party, "the party wishing to make such disclosure shall give at least three (3) business days advance notice in writing to the counsel who designated such discovery materials as Confidential." *Id.* at ¶ 6. The terms "customer" and "competitor" are defined by the order. *Id.*

The designation of particular discovery material as confidential does not require that it permanently remain subject to the protections of CMO–3. Rather, any party or aggrieved entity (even if not a party) can petition the court for declassification of confidential discovery materials at any time.

If at any time a party (or aggrieved entity permitted by the Court to inter-

vene for such purpose) wishes for any reason to dispute a designation of discovery materials as Confidential made hereunder, such person shall notify the designating party of such dispute in writing, specifying by exact Bates number(s) the discovery materials in dispute. The designating party shall respond within 20 days of receiving this notification.

If the parties are unable to amicably resolve the dispute, the proponent of confidentiality may apply by motion to the Court for a ruling that discovery materials stamped as Confidential are entitled to such status and protection under Rule 26 of the Federal Rules of Civil Procedure and this Order, provided that such motion is made within forty five (45) days from the date the challenger of the confidential designation challenges the designation or such other time period as the parties may agree. The designating party shall have the burden of proof on such motion to establish the propriety of its Confidential designation.

If the time for filing a motion ... has expired without the filing of any such motion, or ten (10) business days (or such longer time as ordered by this Court) have elapsed after the appeal period for an order of this Court that the discovery material shall not be entitled to Confidential status, the Confidential Discovery Material shall lose its designation.

CMO–3 at ¶ 9(b)–9(d).

A petition for wholesale modification of the protective order is expressly permitted: "Nothing in this Order shall prevent any $_{party}$ or other person from seeking modification of this Order or from objecting to discovery that it believes to be otherwise improper." *Id.* at ¶ 16.

## C. Agreement by Egilman to be Bound by Protective Order

In August of 2006, The Lanier Law Firm ("Lanier"), representing plaintiffs in this litigation, began consulting with Dr. David Egilman, M.D., M.P.H. Aff. of Richard D. Meadow at ¶ 3 (January 2, 2007) ("Meadow Aff."). Lanier decided in October of 2006 that Egilman's active involvement would assist plaintiffs. Before granting Egilman electronic access to the document depository maintained by the PSC, the firm asked him to sign the "Endorsement of Protective Order" attached to CMO–3. *Id.* at ¶¶ 4–5.

On November 10, 2006, Egilman signed the protective order after making numerous deletions and edits to its text. The following line had been crossed out by him: "I also understand that my execution of this Endorsement of Protective Order, indicating my agreement to be bound by the Order, is a prerequisite to my review of any information or documents designated as Confidential pursuant to the Order." After the sentence reading "I further agree that I shall not disclose to others, except in accord with the Order, any Confidential Discovery Materials, in any form whatsoever, and that such Confidential Discovery Materials and the information contained therein may be used only for the purposes authorized by the Order," he added the words "unless release is needed to protect public health." Tr. of Hr'g on Preliminary Injunction at 203 (January 16–17, 2007) ("Tr.").

Lanier immediately informed Egilman that his amendments to the executed protective order were unacceptable, and that he was required to sign an unamended copy of the order if he wished to gain access to the confidential discovery documents. *Id.* at 205; Meadow Aff. at ¶ 6. On November 14, 2006 Egilman signed a fresh Endorsement of Protective Order. The

order was unedited except for the addition of a clause after the line beginning "I further agree that I shall not disclose to others ...", reading "unless this conflicts with any other sworn statements." When questioned by Richard Meadow of the Lanier Law Firm about why the addition of this clause was made,

> Dr. Egilman explained that if he were to be subpoenaed by the FDA or Congress, he wanted to ensure that the Protective Order would not preclude providing testimony concerning Zyprexa. Since that explanation did not conflict with my [Meadow's] understanding of the purposes behind the Protective Order, nor did it conflict with my understanding that the Protective Order would not – – in any event— have precluded such testimony by Dr. Egilman, and because Dr. Egilman assured me that he understood the Protective Order, [the Lanier Law Firm] accepted this Protective Order [signed by Egilman].

Id. at ¶ 7; see also Tr. at 208, 221–22. Lanier did not inform Lilly about the addition Egilman made. Id. at 207.

After he executed the Endorsement of Protective Order, Egilman was given access to the PSC-maintained database of materials produced in discovery. The confidential materials maintained in that database were stamped, as already noted, "Zyprexa MDL 1596: Confidential–Subject to Protective Order." See CMO–3 at ¶ 4(b).

### D. Conspiracy of Berenson, Egilman, and Gottstein

About the time that Egilman was retained as a plaintiffs' expert in the Zyprexa litigation, he began discussing Zyprexa with New York Times reporter Alex Berenson. Berenson wanted to review the confidential Zyprexa documents, which he knew were subject to this court's protective order. The two conferred about the possibility of obtaining the protected documents by subpoena.

Neither Berenson nor Egilman were aware of any pending case where the Zyprexa documents were likely to be subpoenaed. To circumvent this barrier, Berenson suggested that Egilman contact James Gottstein, an attorney in Alaska who heads the Law Project for Psychiatric Rights ("PsychRights"). Tr. at 94–97. Gottstein had spoken to Berenson in the past about drug-related news items. Id. at 95. Based on these conversations, Berenson believed that Gottstein would be a willing ally in an attempt to avoid the court's protective order by finding a case which could be used as a pretense for subpoenaing the protected documents. Id. at 96 (Gottstein: "[Berenson] said that Dr. Egilman had some documents that he wanted to get to the New York Times and that [Berenson] had, you know, thought that I might be someone who would subpoena them."). But cf. Tom Zeller, Jr., Documents Borne by Winds of Free Speech, N.Y. Times, Jan. 15, 2007 ("[Gottstein] somehow got wind (and precisely how is the subject of separate legal jujitsu) that Dr. Egilman had some interesting documents.... Mr. Gottstein was also apparently in a sharing mood, which is how hundreds of pages ended up with a Times reporter, Alex Berenson.").

On November 28, 2006, Egilman called Gottstein. See Tr. at 23. After telling Gottstein that Berenson had suggested that Egilman contact him, Egilman indicated that he had access to confidential Lilly documents pertaining to Zyprexa, and was in possession of those documents subject to a protective order that precluded him from disseminating them.

Q: [Y]our understanding based on your conversation with Dr. [Egilman] was that he called you so that you could assist him in disseminating the docu-

ments that were subject to a protective order, right?

. . . . .

[Mr. Gottstein]: I think that is probably correct.

Id. at 24–26.

*E. Subpoenas Issued by Gottstein*

Egilman informed Gottstein that under the terms of the protective order the documents could be produced pursuant to a subpoena if certain procedures were followed including notifying Lilly. *Id.* at 24–30, 73–74 (Gottstein: "[Egilman] suggested that I subpoena [the documents].... I think because he thought they should become public."). Gottstein asked Egilman to send him a copy of the protective order, but according to Gottstein, "[Egilman] said I didn't want it and I didn't push it.... My kind of sense of [Egilman's reasoning] was that if I didn't have it, then I wouldn't be charged with the knowledge of it." *Id.* at 27–28.

Gottstein was not involved in any litigation in which it would have been appropriate to subpoena the Zyprexa documents. *Id.* at 31–32, 76. He told Egilman, however, that he would try to find a case in which it would be possible to justify a subpoena directed to Dr. Egilman. On December 5, 2006, Gottstein filed intervention papers in a proceeding where the public guardian, the Alaska Office of Public Advocacy, had been granted guardianship over an individual, including the power to approve administration of psychotropic medications; the administration of Zyprexa was not at issue. *Id.* at 33.

Pursuant to Gottstein's request, the Alaska superior court ministerially and *ex parte* issued a deposition subpoena in the guardianship proceeding on December 6, 2006 to Egilman requiring him to participate in a telephonic deposition on December 20, 2006 and *"bring with him"* all

documents in his possession relating to fifteen drugs, including Zyprexa. *Id.* at 34–35. Egilman faxed a copy of this subpoena to Lilly's General Counsel on December 6, 2006. He did not notify the Lanier Law Firm, which had retained him as an expert, about the subpoena.

On December 11, 2006, Gottstein—*ex parte* and without notice to Lilly—procured an "amended subpoena" that required Dr. Egilman to deliver the documents to Mr. Gottstein *"prior to"* his deposition on December 20, 2006. Gottstein emailed a copy of the second subpoena to Dr. Egilman, asking him to "please deliver the subpoena'd [sic] materials to me as soon as you can".

Neither Egilman nor Gottstein informed Lilly, or Lanier, about the second subpoena or the revised earlier production date.

Q: [Y]ou had told Dr. [Egilman] repeatedly that he should send the second subpoena to Lilly, correct?

[Mr. Gottstein]: Yes.

Q: And you knew he planned not to send it to Lilly, correct?

[Mr. Gottstein]: Yeah, I think—he told me he didn't see that it made any difference.

Q: And you decided that it was not important for you to send the subpoena to Lilly either, correct?

[Mr. Gottstein]: My ... position is that it was his responsibility under the CMO and not mine.

Id. at 43–44.

The excuse offered to justify the issuance of the second "forthwith" subpoena—that Gottstein needed to study the documents before the telephonic appearance of Egilman took place—was a subterfuge. Tr. at 47–48. Gottstein and Egilman deliberately misled Lilly and violated the terms of CMO–3 by not informing Lilly

about the second subpoena. Gottstein attempted to justify his pretense as follows:

Q: You moved the date of the production of documents up, correct?

[Gottstein]: Well, I mean, what it said was—it's like I put in the Email, it didn't make any sense for him to bring the documents with him in Attelboro, Massachusetts for me to try to examine them in Anchorage, Alaska. So I had an amended one that said to give it to me prior to the deposition and [to] give it to me as soon as he could so I would have a chance to review them before the deposition.

. . . . .

Q: When you issued the subpoena … you … said you needed the subpoena … so that you could review the documents in advance of [Egilman's] deposition, correct?

[Gottstein]: Yes.

Q: And instead of reviewing the documents you start making copies of them as soon as you received them, correct?

[Gottstein]: Yes.

Q: And you proceeded to make copies for the next two days and send them out to the people on your and [Egilman's] list, correct?

[Gottstein]: I made two batches.

. . . . .

Q: This is the question I want to make clear. You were so busy [making] copies of these documents that you never got to review them, did you?

[Gottstein]: I looked at some of them. The deposition was quite—a few days off which is, I think, your complaint. So I would pull up some of them and look at them and I—and it wasn't that I was so busy making copies. I had my laptop burning DVDs and my main computer burning DVDs, another laptop. . . .

Id. at 42–43, 47–48.

### F. Response to the Subpoenas

On December 13, 2006, Lilly contacted the Lanier Law Firm to discuss the first subpoena issued to Dr. Egilman, the only subpoena about which Lilly had been informed. Upon ascertaining that Lilly intended to file a motion to quash that subpoena in the Alaska Superior Court, Richard Meadow of the Lanier Firm spoke to Egilman and instructed him "not to do anything" in response to the subpoena until Lilly had a chance to address the Alaska court. Egilman agreed, *see* Meadow Aff. at ¶ 9, although he had already begun the transfer to Gottstein. *See* Part II.E, *supra.*

The next day, December 14, 2006, Lilly sent a letter to Egilman and Gottstein, asking "Dr. Egilman to refrain from producing [the confidential documents] and Mr. Gottstein to refrain from further seeking production of the materials unless and until the Superior Court [of Alaska] rules that production is required." Egilman, as a signatory to the protective order, was further asked to confirm to Lilly that he would refrain from producing the materials.

Unbeknownst to Lilly or Lanier, Egilman had already begun transferring the documents to Gottstein on December 12, 2006, supposedly pursuant to the second subpoena, immediately after that subpoena was issued. In response to Lilly's letter of December 14th, Egilman wrote to Lilly's counsel that he had already produced the confidential documents that were subject to the subpoena. Egilman stated his view that he had given Lilly a "reasonable opportunity to respond" to the subpoena as required by CMO–3, and was therefore not in violation of his obligations when he pro-

duced the documents six days (out of which three were business days) after he had received the first subpoena. He did not address the question of why he never notified Lilly about the second subpoena with its revised production date.

On December 15, 2006, after learning that Egilman had produced the documents to Gottstein pursuant to a second subpoena about which Lilly had never been informed, Lilly wrote to Gottstein, asking him to (1) identify the protected materials in his possession and return them to Lilly, (2) refrain from further publishing or publicizing the protected materials, (3) request the return of the materials from anyone to whom he had sent them, and (4) identify those individuals to whom he had sent protected materials.

### G. Discharge of Egilman by Lanier

As soon as Lanier learned of Egilman's disclosure of the confidential documents to Gottstein, the firm demanded that Egilman return all Zyprexa-related documents in his possession. It terminated his consultancy. *Id.* at ¶ 11; Tr. at 200.

### H. Dissemination of the Documents Pursuant to Conspiracy

#### 1. Acts of Conspirators

During their initial conversation in November 2006, Egilman told Gottstein that when he eventually received the documents—pursuant to a yet-to-be-procured subpoena issued in a yet-to-be-determined case—he should pass them along to certain individuals. That group included Berenson of the New York Times, Steve Cha from the United States House of Representatives Committee on Government Reform, United States Senate staffer Amelia Desanto, and Snighda Prakash of National Public Radio. *Id.* at 35–37.

Q: Dr. Egilman understood that once [the documents] were subpoenaed, that you were going to disseminate them to the individuals that you later certified as having disseminated them to?

[Mr. Gottstein]: Yes ...

Q: Did he share with you anybody that he would like to have them disseminated with?

[Mr. Gottstein]: Yes.

Id. at 35–36.

As soon Egilman started electronically transferring the documents to Gottstein via Gottstein's file transfer protocol ("FTP") server on December 12, 2006, Gottstein began sending them to individuals to whom he thought they would be of interest. He had spoken with some of these people beforehand to inform them that an arrangement to obtain and publish confidential Lilly documents was underway. *Id.* at 57 (Gottstein: "Some people knew [the documents] were coming"). That group included Berenson, Steve Cha, Vera Sharav, Will Hall, and Robert Whitaker. *Id.* at 93.

On December 12th, 13th, and 14th, Gottstein provided DVDs containing the documents to Berenson, as well as Dr. Peter Breggin, Steve Cha, Judi Chamberlin, Dr. David Cohen, Terri Gottstein, Will Hall, Dr. Grace Jackson, Dr. Stephen Kruszewski, Snigdha Prakash, Vera Sharav, Robert Whitaker, Bruce Whittington, James Winchester, and Laura Ziegler. *Id.* at 47–48.

Q: [Y]ou were anxious to get [the documents] out as quickly as you could, right?

[Mr. Gottstein]: Anxious, yes, I thought it would be good to get them out.

Q: Before the Court could enter an order telling you you shouldn't?

[Mr. Gottstein]: Well, I don't know. I mean I guess.... I knew that Eli Lilly would want to try to stop it.

Q: Right, and you wanted to get them out as quickly as you could to make that harder?

[Mr. Gottstein]: Well, I would say yeah, I wanted to get them out [in a] way that would make it impossible to get them back.

Id. at 48–49. To simplify and hasten co-conspirator Berenson's review and use of the documents, Gottstein had provided Berenson with a password to Gottstein's personal FTP server on which he had electronically posted the documents.

Gottstein and Berenson spoke to each other repeatedly during the week of December 12th. *Id.* at 99. Berenson urged Gottstein not to send the documents to any news or media outlets, because he wanted to ensure that the New York Times would have a "scoop" on the story. *Id.* at 82–83. He threatened that the Times would not write about the Zyprexa documents if any news organization published a story based on them before the Times printed its first article. *Id.* at 83 (Gottstein: "[Berenson] said basically that if anybody else breaks it, they are not going to run the story.").

Because he wanted a newspaper with an outstanding national reputation such as the New York Times to publish the documents, Gottstein acceded to Berenson's request. *Id.* at 82–83 (Gottstein: "[T]here were other news outlets that I was going to send them to. And I ended up not doing that . . . . [t]o accommodate the New York Times's desire to break the story."). Egilman agreed with the decision to refrain from sending the documents to any other news organizations until Berenson was able to break the story. *Id.* at 83.

### 2. Protectable Distributed Documents

The court has examined a sampling of the documents distributed by the conspirators. It has viewed portions of the materials returned to the Special Master for Discovery, Peter Woodin, pursuant to his and the court's orders. Among them are a substantial number whose publication would be annoying, embarrassing, oppressive, and burdensome to Lilly; they reveal trade secrets, confidential preliminary research, development ideas, commercial information, product planning, and employee training techniques. *See also, e.g.,* Alex Berenson, *Eli Lilly Said to Play Down Risk of Top Pill,* N.Y. Times, Dec. 17, 2006, at A1; Alex Berenson, *Drug Files Show Maker Promoted Unapproved Use,* N.Y. Times, Dec. 18, 2006, at A1; Editorial, *Playing Down the Risks of a Drug,* N.Y. Times, Dec. 19, 2006; Alex Berenson, *Disparity Emerges in Lilly Data on Schizophrenia Drug,* N.Y. Times, Dec. 21, 2006, at A1.

These documents are covered by CMO–3. They are included within the kind of documents protectable under Rule 26(c) of the Federal Rules of Civil Procedure. *See* Part IV.A, *infra.*

A small portion of the documents disseminated have been, or may be, declassified under CMO–3. Lilly has taken steps towards declassifying them. *See* Pet'r Br. at 12 n.10 ("Prior to this dispute, Lilly had de-designated following [sic] bates ranges, each of which is among those at issue here: [listing bates ranges]").

### I. Attempts by Special Master Woodin to Retrieve Documents

On December 15, 2006, Lilly informed the Special Master for Discovery, Peter Woodin, that confidential documents subject to CMO–3's protection had been disseminated pursuant to a subpoena of which Lilly had never been notified. Lilly and the PSC *jointly* requested that the Special Master issue an order requiring return to him by Gottstein of the confidential documents.

After trying unsuccessfully to reach Gottstein by telephone, Special Master Woodin issued the order requested by the parties. A copy of that order was emailed to Gottstein by the Special Master. Upon

receiving it, Gottstein replied that he had voluntarily ceased disseminating the documents after reading Lilly's faxed letter of December 15th. *See* Part II.F, *supra.* He objected to the *ex parte* nature of the order, and questioned both this court's jurisdiction over him and Special Master Woodin's authority to issue such an order. Gottstein informed Berenson about the Special Master's order, but made no further efforts to comply with its terms. Tr. at 100.

### J. Publication by N.Y. Times

On December 17, 2006, the New York Times began publishing front page articles under Berenson's byline about information contained in the confidential Lilly documents. *See* Alex Berenson, *Eli Lilly Said to Play Down Risk of Top Pill,* N.Y. Times, Dec. 17, 2006, at A1; Alex Berenson, *Drug Files Show Maker Promoted Unapproved Use,* N.Y. Times, Dec. 18, 2006, at A1; Alex Berenson, *Disparity Emerges in Lilly Data on Schizophrenia Drug,* N.Y. Times, Dec. 21, 2006, at A1; *see also* Editorial, *Playing Down the Risks of a Drug,* N.Y. Times, Dec. 19, 2006; Julie Creswell, *Court Orders Lawyer to Return Documents About an Eli Lilly Drug,* N.Y. Times, Dec. 20, 2006.

### K. Formal Court Intervention

Since Gottstein had not complied with Special Master Woodin's order by December 18th—although Gottstein had provided a lengthy response to the order detailing some of the facts of his collaboration with Egilman and suggesting jurisdictional objections—Lilly and the PSC jointly petitioned the court for an injunction requiring Gottstein to return the documents.

### 1. Argument Before Magistrate Judge Mann

The parties first sought an injunction from magistrate judge Mann. At the hearing the magistrate judge made the following comment:

> I think that what happened here was an intentional violation of Judge Weinstein's orders. I think it was inappropriate. . . .
>
> I personally [as a magistrate judge, without authority to grant injunctive relief] am not in a position to order you [Gottstein] to return the documents. I can't make you return [the documents], but
>
> I can make you wish you had because I think this is highly improper not only to have obtained the documents on short notice without Lilly being advised of the amendment but then to disseminate them publicly before it could be litigated. It certainly smacks [of] bad faith.

Tr. of Hr'g on Preliminary Injunction at 10 (Dec. 18, 2006).

### 2. Temporary Restraining Order by Judge Cogan

On the basis of Judge Mann's findings, the parties brought their request for an injunction on December 18th to Judge Cogan, who, as emergency judge, acted in the absence of Judge Weinstein. After hearing from Lilly, the PSC, and Gottstein through his counsel, Judge Cogan issued a temporary restraining order based upon his finding that "Mr. Gottstein has deliberately and knowingly aided and abetted Dr. David Egilman's breach of CMO-3". *See In re Zyprexa Prods. Liab. Litig.,* No. 04–MD–1596, 2006 WL 3877528, *1 (E.D.N.Y. Dec. 19, 2006). Judge Cogan declared:

> I think it's clear not only that the facts are as stated in the Magistrate's report and recommendation, but I can tell from the December 17th draft letter from Mr. Gottstein that he was aware that these documents were restricted, and that he undertook procedures to help the expert[ ], Mr. Egilman, try to circumvent

the restrictions that were on him. He deliberately aided and abetted Dr. Egilman in getting these documents released from the restriction that they were under, under the protective order. He knew what he was doing, and he did it deliberately. Those are my findings, and it's on that basis that I grant the relief.

Tr. of Hr'g on Preliminary Injunction at 19–20 (Dec. 18, 2006).

Gottstein was ordered not to further disseminate the documents; to return them to Special Master Woodin; to provide a list of all individuals and organizations to whom he had sent them; to identify to Special Master Woodin which of the confidential documents he passed on to other individuals; to take steps to retrieve them; and to preserve all communications relating to them or Egilman. *In re Zyprexa, supra,* 2006 WL 3877528.

Over the next few days, Gottstein took steps to comply with the terms of the court's order. He emailed or called each of the people to whom he had sent the documents informing them of the court order and asking that the documents be returned to Special Master Woodin. Tr. at 101–02. Those individuals included: Dr. Peter Breggin, Steve Cha, Judi Chamberlin (of MindFreedom International), Dr. David Cohen, Terri Gottstein, Will Hall, Dr. Grace Jackson, Dr. Stephen Kruszewski, Snigdha Prakash, Vera Sharav (of the Alliance for Human Research Protection), Robert Whitaker, Bruce Whittington, James Winchester, and Laura Ziegler. *See* Part II.H.1, *supra.*

On December 21, 2006, Gottstein issued a written certification stating he had complied with the terms of Judge Cogan's injunction. Dr. Peter Breggin, Dr. Grace Jackson, Dr. Stephen Kruszewski, Bruce Whittington, Laura Ziegler, and the House Committee on Government Reform (through Congressman Henry Waxman,

for Steve Cha) returned the documents they had received from Gottstein to Special Master Woodin. *See* Letter of Rep. Henry A. Waxman (Dec. 21, 2006); Letter of Special Master Woodin (Feb. 1, 2007). Gottstein also retrieved the copies he had given to Terri Gottstein, Jerry Winchester, and Will Hall and sent them to the Special Master. *See id.* Berenson, Dr. David Cohen, Judi Chamberlin, Vera Sharav, Robert Whitaker, and Snighda Prakash have not returned their copies of the confidential documents. At the court's direction, Ms. Sharav gave her attorney the DVDs containing her copies of the documents to be held in escrow. Tr. at 194; *see* Part IV.H.8, *infra.*

### 3. Order to Show Cause for Deposition of Egilman by Judge Weinstein

On December 26, 2006, Lilly petitioned for an order requiring Egilman to show cause why he should not submit to a deposition and produce documents relating to his possession and dissemination of the confidential Zyprexa documents. A hearing was held on December 28, 2006 by Judge Weinstein at which Egilman was ordered to be deposed within five days and to produce the requested documents.

Egilman began producing documents to Lilly on January 1, 2007. An as-yet-unresolved question is whether this production has been complete.

Egilman has invoked what he claims to be a Fifth Amendment privilege against self-incrimination. *See* Letter of Edward W. Hayes (Jan. 23, 2007). He has neither been deposed nor testified in court.

### 4. Evasive Actions of Enjoined Persons

Individuals to whom Gottstein sent the documents began devising schemes to evade court orders to return the documents even before any such orders had

been issued. In an email dated December 16, 2006, Robert Whitaker wrote to Gottstein: "I would consider building a website that would, ahem, make all the documents available. What could they do to me? And how could they know how the documents got to me? There are several channels apparently that could be the source. You should proceed now in whatever way makes it easiest for you, and let others worry about getting this information out or making it public." Pet'r Findings of Fact, supporting ex. 30.

On December 29, 2006, Lilly learned that despite Gottstein's communication of the court's order requesting the documents' return by those to whom Gottstein had sent them, some recipients had declined to comply and were attempting to widely distribute the documents. In particular, MindFreedom, an organization whose board of directors includes Judi Chamberlin, Tr. at 236, to whom Gottstein had sent the documents in his attempt to "get [the documents] out [in a] way that would make it impossible to get them back," *id.* at 49, was attempting widespread dissemination.

David Oaks, the Director of MindFreedom, sent an email alert to the organization's members informing them of a "grassroots internet campaign" to disseminate the documents. *See* Pet'r Findings of Fact, supporting ex. 24. The email, which included a link to a website from which the documents could be downloaded, was sent on December 25, 2006. According to this message, the organization was "counting on the fact that many courts are closed today." *Id.* Eric Whalen, a member of MindFreedom, made the documents available for downloading at the website www.joysoup.net. Tr. at 229.

After the preliminary injunction was issued on December 29, 2006, several of the enjoined persons continued their efforts to ensure that the documents remained publicly accessible. In an email exchange on January 2, 2007 among Robert Whitaker, Vera Sharav, Will Hall, David Oaks, and Gottstein, Whitaker offered his gratitude to those who had helped disseminate the documents notwithstanding court orders prohibiting them from doing so: "[K]udos should go to others who have helped get this information out – Will Hall, David Oaks, Vera Sharav, MindFreedom. This is a fight very much worth fighting." *See* Pet'r Findings of Fact, supporting ex. 28. Sharav responded, "It's important to keep track of where/when the documents may surface again on cyberspace and *let people know.*" *Id.* (emphasis supplied). Will Hall added, "what a great new years gift ... massive eli-lilly psych drug scandal." *Id.*

### 5. Preliminary Injunction by Judge Cogan

Lilly and the PSC jointly applied for an injunction ordering the people who had received the documents directly from the conspirators (omitting, however, Berenson and the New York Times) to refrain from disseminating them. On December 29th, a preliminary injunction was issued by Judge Cogan barring Terri Gottstein, Jerry Winchester, Dr. Peter Breggin, Dr. Grace Jackson, Dr. David Cohen, Bruce Whittington, Dr. Stephen Kruszewski, Laura Ziegler, Judi Chamberlin, Vera Sharav, Robert Whitaker, and Will Hall from disseminating the documents, requiring that they remove the documents from any website to which they had posted them, and instructing them to communicate the terms of the order to anyone to whom they had sent the documents. *In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2006 WL 3923180, *1 (E.D.N.Y. Dec. 29, 2006).

After receiving notice of the injunction, Vera Sharav put the following message on AHRP's website:

See the court injunction several of us received below but the internet is an uncontrolled information highway. You never know where and when the court's suppressed documents might surface. The documents appear to be downloadable at [two websites for which the addresses are provided].

Tr. at 182.

### 6. Hearing on Permanent Injunction by Judge Weinstein

The December 29, 2006 preliminary injunction issued by Judge Cogan expired by its terms on January 3, 2007, on which date a hearing was commenced by Judge Weinstein to consider whether the injunction should be extended or modified. The parties who were present—Lilly, the PSC, Terri Gottstein and Judi Chamberlin—agreed to extend the preliminary injunction until January 16, 2007, at which time a full evidentiary hearing would be held. Tr. of Preliminary Injunction Hr'g at 15–18 (Jan. 3, 2007).

On January 4, 2007, at Lilly's request, Judge Weinstein expanded the enjoined parties to include two organizations—MindFreedom and AHRP—, five websites—www.joysoup.net, www.mindfreedom.org, www.ahrp.org, www.ahrp.blogspot.org, and zyprexa.pbwiki.com—, and one individual, Eric Whalen, all of whom were allegedly attempting to disseminate the confidential documents. *Id.* at 18, 28–30; *In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2007 WL 27117, *1 (E.D.N.Y. Jan. 4, 2007). On January 12, 2007, Lilly indicated to the court its intent to initiate contempt proceedings against both Egilman and Gottstein.

The scheduled evidentiary hearing was held on January 16 and January 17, 2007. All enjoined parties, with the exception of Jerry Winchester, Dr. Peter Breggin, Dr. Grace Jackson, Dr. Stephen Kruszewski, Laura Ziegler, Will Hall, Eric Whalen, and the five websites, were represented at the hearing. Counsel for "John Doe", an anonymous person who yearned to post the documents on the enjoined website zyprexa.pbwiki.com, was present.

Lilly called four witnesses: James Gottstein, Richard Meadow of the Lanier Law Firm, Vera Sharav, and David Oaks. No other party called witnesses. The witnesses were allowed to be cross-examined by attorneys for each of the parties, including Egilman.

On January 16, 2007, the expanded preliminary injunction of January 4th was extended until there was a decision on the motion for a permanent injunction. *In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2007 WL 160925, *1 (E.D.N.Y. Jan. 16, 2007) ("The temporary mandatory injunction issued on January 4, 2007 is extended until the court rules on the motion to modify the injunction which is currently pending.").

### 7. Invitation to Berenson to Appear by Judge Weinstein

#### a) Invitation

Berenson had not appeared in these injunction proceedings. To allow him to appear and confront the evidence of conspiracy offered against him at the January 16–17, 2007 hearing, the court invited him to appear and testify as to his involvement. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2007 WL 276185 (E.D.N.Y. Jan. 29, 2007).

The invitation issued to Berenson in the form of an order is set forth below:

Alex Berenson, reporter for the New York Times, is invited to voluntarily appear on February 7, 2007 at 10:00 a.m. in the Federal Courthouse, 225 Cadman Plaza East, Brooklyn, New York, Courtroom 10B South, to explain the circumstances of his obtaining documents sealed by the court. If Mr. Berenson

chooses to appear, he may be accompanied by his attorney, will be sworn, and will be subject to cross-examination.

This invitation is intended to permit Alex Berenson to confront testimony received at a hearing in this court on January 16–17, 2007 implicating him in a conspiracy to obtain and publish confidential documents sealed by this court.

The attention of Mr. Berenson is directed to the following portions of a transcript of the January 16–17, 2007 hearing. References to "Gottstein" are to James Gottstein, an attorney in Alaska who allegedly forwarded documents received from Dr. David Egilman to Mr. Berenson. Dr. Egilman was a plaintiffs' expert who had agreed not to violate this court's order sealing these documents, but who then sent them to Mr. Gottstein, who in turn transmitted them to Mr. Berenson and others.

> Q [attorney for Eli Lilly & Company]: ... Did you ever have communications with Dr. Egilman between the time that you received the documents and December 17 when the New York Times published a portion?
>
> A [Gottstein]: Did I have communications with Dr. Egilman?
>
> Q: Yes. A: Yes.
>
> . . . . .
>
> Q: What did you talk about?
>
> A: I think most of it was around the New York Times story and their desire to have—to break it. . . . .
>
> The Court: You say their, who do you mean?
>
> A: The New York Times desire to be able to break the story.
>
> Q: What did Dr. Egilman say about that? A: That was basically it. . . .
>
> . . . . .

I mean there were other news outlets that I was going to send them to. And I ended up not doing that.

> Q: Why?
>
> A: To accommodate the New York Times's desire to break the story.
>
> Q: Who communicated that desire?
>
> A: Well, Alex Berenson called me about that. Q: What did he say?
>
> A: He said basically that if anybody else breaks it, they are not going to run the story.
>
> Q: So what? Why was that important to you?
>
> A: Well, because I think the New York Times is maybe the best place to have had this happen from my perspective.
>
> Q: And from Dr. Egilman's perspective also?
>
> . . . . .
>
> A: I think he wanted the New York Times to be the first to publish it.
>
> Q: Why do you think that?
>
> A: Because he wanted me to not send it to other news outlets.
>
> Q: What did he tell you about why you shouldn't send it to other news outlets?
>
> A: Basically, the same thing, that the New York Times wouldn't run it if someone else broke it.

Tr. of Hr'g, 81–83 (January 17, 2007).

> Q: Before you talked to Dr. Egilman on November 28, did you have any discussions with Alex [Berenson] about the Zyprexa documents in this litigation?
>
> A: No.
>
> Q: After that conversation with Dr. Egilman on November 28th, how soon after that conversation did you start to have communications with Alex Berenson about the Zyprexa documents?
>
> A: Within a few days, I think.

Q: How did that communication start? Did you call him or did he call you?

A: I believe he called me.

Q: And how did he get your name, do you know?

. . . . .

A: Do I know how? I think that he was independently aware of what I was doing.

Q: How do you think he became independently aware of what you were doing?

A: I believe that I had e-mailed him before.

Q: Before what?

A: Maybe earlier in the year or a couple of years ago sometime because I had been trying to get publicity about this stuff for years really. So I made contacts with a lot of reporters and I believe that I had contacted Mr. Berenson before.

Q: What caused him to call you three days after your conversation with Dr. Egilman?

A: This would be around what? The second of December or something?

Q: Early December.

A: What caused him to call me? I think he was working on a story on this.

Q: Why did he call you? What did he tell you when he called you?

A: He told me that he had given Dr. Egilman my name.

Q: Alex Berenson had given Dr. Egilman your name?

A: Yes.

Q: Is that how Dr. Egilman came to contact you on November 28?

A: I think so.

Q: And you said that he had told you that he had given Dr. Egilman your name. Help me understand that. What did he say?

A: He said that Dr. Egilman had some documents that he wanted to get to the New York Times and that he had, you know, thought that I might be someone who would subpoena them.

Q : Alex Berenson told you that Dr. Egilman thought you would be someone who would help him, meaning Dr. Egilman, get the Zyprexa documents to the New York Times, right?

A: Well .... what I said was that he thought I was someone who might subpoena the documents.

Q: And so how—so Alex Berenson gives Dr. Egilman your name, correct, that's what he said?

A: That's what he said.

Q: Then Dr. Egilman calls you on November 28 and says I have some documents you might want to subpoena, right?

A: Did he say that exactly? I think that's the import of it.

Q: And did the two of you when you were talking on November 28 talk about this relationship you both had with Alex Berenson?

A: I may have mentioned that I tried to contact him before, that I might have tried to contact him before.

The Court: Him is who? A: Mr. Berenson.

Q: Did you tell Dr. Egilman that you had spoken with Alex [Berenson] and that you understood that he had given Dr. Egilman your name?

A: Yes, I think at some point that was communicated one way or another.

. . . . .

Q: But ... you learned that [Dr. Egilman calling you] was not out of the blue, it was actually orchestrated by Dr. Egilman and Alex Berenson, right?

A: Well, I don't know how that is inconsistent with what I wrote in my letter. It was out of the blue.

Q: It was out of the blue for you, right?

A: Yes.

Q: But it was not out of the blue for Dr. Egilman or Alex Berenson?

. . . . .

A: So I mean out of the blue—I mean—it seemed that—it's like I said, what Alex Berenson told me was that he had told Dr. Egilman that I might be someone who would subpoena the documents so I don't know where out of the blue comes into that.

. . . . .

Q: After the conversation that you had with Dr. Egilman on November 28, you agreed to subpoena the documents, correct?

A: Yes. Well, to at least try to. To try and find a case to do that.

Q: Okay. And you continued to communicate with Alex Berenson prior to your receipt of the documents relating to the articles that he was planning or hoping to write about Zyprexa, correct?

A: Prior to?

Q: Yes.

A: There may have been some.

Tr. of Hr'g, 95–99 (January 17, 2007).

Lilly shall forthwith serve a copy of this invitation on Alex Berenson, together with all papers filed in the current proceedings to obtain an injunction, including the full transcript of the January 16–17, 2007 hearing. Copies of this order, but not the accompanying papers, shall be served by Lilly via fax, email, or mail on all attorneys who appeared at the January 16–17, 2007 hearing.

SO ORDERED.

/s/

Jack B. Weinstein

Date: January 29, 2007 Brooklyn, N.Y.

*In re Zyprexa Prods. Liab. Litig.*, 2007 WL 276185 (E.D.N.Y. Jan.29, 2007).

b) Response

By letter dated February 5, 2007, the New York Times responded on behalf of Berenson as follows:

Hon. Jack B. Weinstein United States District Court Eastern District of New York 225 Cadman Plaza East Brooklyn, New York 11201

Re: In re Zyprexa Products Liability Litigation *04–MDL–1596*

Dear Judge Weinstein:

I write in response to your Invitation and Order of January 29, 2007 ("1/29 Order") which, in accordance with Your Honor's instructions, was provided to us by counsel for Eli Lilly, together with other materials pertinent to the motion for a preliminary injunction now pending before the Court.

We have reviewed the materials forwarded to us by counsel and most particularly the 1/29 Order and understand that there has been testimony presented to the Court by others concerning their perceptions of the circumstances that gave rise to The New York Times's receipt of certain materials referenced in a series of articles published in the Times over the course of the last several weeks concerning Zyprexa and the controversy concerning it. On behalf of The Times and Alex Berenson, I would like to thank the Court for offering Mr. Berenson the opportunity voluntarily to appear before the Court and, in Your Honor's words, to "confront [that] testimony."

We know that Your Honor will appreciate the reasons that lead us to decline your invitation. As a matter of long-held principle, we believe that it would be inappropriate for any of our journalists voluntarily to testify about news gathering at the Times, our reporters' communications with their sources or the editorial judgments that are made in

deciding what is and what is not published by the Times, just as we would vigorously resist any effort by any party to compel such testimony. We guard quite zealously our role as a member of a free and independent press and believe quite passionately that, consistent with the principles embodied in the First Amendment, it is not the role of the newspaper or its reporters to submit to cross-examination about such matters even where it may otherwise serve our particular interests in a particular case to do so. I want to emphasize as clearly as I can that in declining Your Honor's invitation we mean absolutely no disrespect whatsoever to the Court.

Consistent with the procedures set forth in the 1/29 Order, by copy of this letter I am requesting counsel for Eli Lilly to forward this correspondence to all interested counsel as I do not have contact information for all concerned.

Thank you for your time and consideration.

Respectfully submitted,

/s/

George Freeman

[Assistant General Counsel, N.Y. Times]

### III. Law

#### A. Public Right of Access to Documents Produced in Discovery

■ A presumption of public access applies to judicial proceedings and documents.

Open courts are critical to a democratic society. Access to judicial proceedings and documents is necessary for federal courts to have a measure of accountability and for the public to have confidence in the administration of justice. The rule of law and public acquiescence in judicial decisions demand that courts reveal the bases for their rulings. Without monitoring, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*In re NBC Universal, Inc.*, 426 F.Supp.2d 49, 51 (E.D.N.Y.2006) (quotations and citations omitted). See also *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) ("the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents"); *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir.1995).

■ The presumption of access varies according to the nature of the judicial document to which access is sought. "Unlimited access to every item turned up in the course of litigation would be unthinkable." *United States v. Amodeo, supra,* at 1048. The Court of Appeals for the Second Circuit has held that "the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* at 1049.

■ The claim of public access is strongest when the documents play a substantial role "in determining litigants' substantive rights." *Id.* Fitting squarely within this definition are "documents that served as the principal basis for a summary judgment motion; were introduced at trial; or were material and important to a decision to approve a consent decree." *In re NBC,* 426 F.Supp.2d. at 53 *(quoting Amodeo)* (quotation marks omitted).

■ Falling outside the definition are documents produced by the parties in discovery.

Documents that play no role in the performance of Article III functions, *such as those passed between the parties in discovery,* lie entirely beyond the presumption's reach, and stand on a different footing than a motion filed by a party seeking action by the court or, indeed, than any other document which is presented to the court to invoke its powers or affect its decisions.

*Amodeo,* 71 F.3d at 1050 (emphasis added) (quotation omitted). See also *S.E.C. v. TheStreet.com,* 273 F.3d 222, 232–33 (2d Cir.2001); *F.T.C. v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 409 (1 st Cir.1987) ("Those documents which play no role in the adjudication process ... such as those used only in discovery, lie beyond reach [of the presumption of access]."); *Anderson v. Cryovac, Inc.,* 805 F.2d 1, 13 (1st Cir.1986) ("There is no tradition of public access to discovery, and requiring a trial court to scrutinize carefully public claims of access would be incongruous with the goals of the discovery process.").

■■■ The entry of a protective order for documents produced in discovery does not affect the assumption of non-access which attaches to those documents. *See S.E.C. v. TheStreet.com,* 273 F.3d 222, 223 (2d Cir. 2001) (rejecting argument that "the very exercise by the District Court of its power to enter a protective order and to seal the Confidential Testimony transformed the Confidential Testimony into a 'judicial document' presumptively open to the public"); *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 782 (3d Cir.1994) ("[W]hen a court enters an order of protection over documents exchanged during discovery, and these documents have not been filed with the court, such documents are not, by reason of the protective order alone, deemed judicial records to which the right of access attaches.").

### B. Protective Orders

#### 1. Generally

■■■ The inherent equitable power of courts to grant confidentiality orders is well-established. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 35, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) ("we have no question as to the court's jurisdiction to [enter protective orders] under the inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices") (quotation omitted); *Int'l Prods. Corp. v. Koons,* 325 F.2d 403, 407–08 (2d Cir.1963); *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 785 (3d Cir. 1994) ("Courts have inherent power to grant orders of confidentiality .... whether or not such orders are specifically authorized by procedural rules."). Courts are endowed with broad discretion to tailor protective orders to the circumstances of a particular litigation. *See Seattle Times,* 467 U.S. at 36, 104 S.Ct. 2199 ("The unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders.").

■■■ The power to seal extends to court filings and documents produced in discovery. *See Pansy,* 23 F.3d at 785 (rejecting the argument "that the district court lacked the power to enter an order of confidentiality over a document which is not in the court file nor incorporated into an order of the court"). As civil discovery rules became more expansive over the course of the last century, the role of the courts in protecting producing parties from undue invasions of privacy has correspondingly increased:

The adoption of the Federal Rules of Civil Procedure in 1938 fundamentally changed ... American procedure. In particular, the discovery system in Rules 26 through 37 revolutionized pretrial preparation. The prior system had lim-

ited a litigant's ability to acquire information largely to what was admissible at trial; since 1938, a litigant has been able to secure the production of information on a vastly broadened scale—essentially, any information that conceivably could be of help in preparing the case.... The goals underlying the expansion of the discovery process were to facilitate preparation, to avoid surprise at trial, and to promote the resolution of cases on their merits—not to enlarge the public's access to information. Nonetheless, the expanded scope of discovery under the Federal Rules and the increased amounts of information they generated created side effects outside the adjudicatory system—it posed a threat to privacy and confidentiality. To meet this new problem, the discovery rules contain provisions, such as the authorization for protective orders in Rule 26(c), to limit the discovering party's use of information beyond the litigation context.

Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L.Rev. 427, 447 (1991); *see also* 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2036 (2d ed. 1994) ("Rule 26(c) was adopted as a safeguard for the protection of parties and witnesses in view of the almost unlimited right of discovery given by Rule 26(b)(1).").

Protective orders serve essential functions in civil adjudications, including the protection of the parties' privacy and property rights. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34–35, 104 S.Ct. 2199("It is clear from experience that pretrial discovery ... has a significant potential for abuse. This abuse is not limited to matters of delay and expense; discovery also may seriously implicate privacy interests of litigants and third parties."); *see generally* Miller, *Confidentiality,* at 463–77. "Without an ability to restrict

public dissemination of certain discovery materials that are never introduced at trial, litigants would be subject to needless annoyance, embarrassment, oppression, or undue burden or expense." *S.E.C. v. TheStreet.com,* 273 F.3d 222, 229 (2d Cir. 2001) *(citing* Fed.R.Civ.P. 1).

### 2. Rule 26(c)

#### a) Generally

■ The Federal Rules of Civil Procedure govern the issuance of protective orders covering discovery materials in civil cases. *See* Fed.R.Civ.P. 26(c). "[F]or good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* This rule, like the remainder of the Federal Rules of Civil Procedure, must be interpreted in a manner consistent with Rule 1: "These rules .... shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1; *see also Martindell v. Int'l Tel. & Tel. Corp.,* 594 F.2d 291, 295 (2d Cir.1979) ("the vital function of a protective order issued under Rule 26(c) ... is to secure the just, speedy, and inexpensive determination of civil disputes ... by encouraging full disclosure of all evidence that might conceivably be relevant") (citation omitted).

■ The permissible scope of discovery in the federal courts is very broad: "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). Much of the material produced in discovery is neither incorporated in motions made to the court nor admissible at trial. In order to mitigate the substantial risk to litigants' privacy and other rights posed by the expansive scope of pretrial discovery, courts are giv-

en broad discretion in Rule 26(c) to craft sealing orders "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c); Part II.B.1, *supra; see also* Fed.R.Civ.P. 26 comment ("The information explosion of recent decades has greatly increased ... the potential for discovery to be used as an instrument for delay or oppression.").

 Rule 26(c) provides a non-exhaustive list of eight types of protective orders that courts may issue. *See* Fed.R.Civ.P. 26(c)(1)–(c)(8). "[A] court is not limited to the eight specified types of orders .... [it] may be as inventive as the necessities of a particular case require in order to achieve the benign purposes of the rule." 8 Chalres A. Wright, Arthur R. Miller & Richard L. Marcus at § 2036; *see also Ann L. v. X Corp.,* 133 F.R.D. 433, 435 (W.D.N.Y.1990) ("an order of suppression is a permissible remedy under the 'catch all clause' of Fed.R.Civ.P. 26(c)"). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times,* 467 U.S. at 36, 104 S.Ct. 2199. The touchstone of the court's power under Rule 26(c) is the requirement of "good cause." The burden to establish good cause is placed on the party seeking protection. *See* 8 Wright & Miller at § 2035.

 To determine whether good cause exists, courts balance "the need for information against the injury that might result if uncontrolled disclosure is compelled." *See Pansy,* 23 F.3d at 787 *(quoting* Miller, *Confidentiality).* Balancing requires taking into account litigants' privacy rights as well as the general public's interest in the information. *See TheStreet.com,* 273 F.3d at 234. The balance struck should incorporate consideration of the overarching purpose of the discovery process: "Discovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public." *Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982); *see also* Richard L. Marcus, *Myth and Reality in Protective Order Litigation,* 69 Cornell L.Rev. 1, 57 (1983) ("The speculative possibility that in some cases the public would benefit from dissemination of information garnered through discovery hardly warrants the conversion of the process into an investigatory tool for inquisitive litigants.").

b) Subsection 7

Subsection (7) of Rule 26(c) provides for the issuance of a protective order requiring "that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way". This "open-ended series of terms ... need not be limited to 'true' trade secrets." 8 Wright & Miller at § 2043. "Documents falling into categories commonly sealed are those containing trade secrets, confidential research and development information, marketing plans, revenue information, pricing information, and the like." *Cumberland Packing Corp. v. Monsanto Co.,* 184 F.R.D. 504, 506 (E.D.N.Y.1999). Examples of protective orders covering commercial documents include: *Sullivan Mktg. v. Valassis Commc'ns,* 1994 WL 177795, 1994 U.S. Dist. LEXIS 5824 (S.D.N.Y.1994) (granting protective order to defendant publisher that restricted access to sensitive business contracts, proposals and negotiations); *Moore U.S.A., Inc. & Toppan Forms Co., Ltd. v. Standard Register Co.,* 2000 WL 876884, 2000 U.S. Dist. LEXIS 9137 (W.D.N.Y.2000) (protecting documents containing trade secrets and confidential research and development information); *Vesta Corset Co. v. Carmen Founds.,* 1999 WL 13257, *2, 1999 U.S. Dist. LEXIS 124, at *5 (S.D.N.Y.1999) (refusing disclosure of confidential commer-

cial information such as "pricing, profits, costs, overhead, manufacturing specifications, customer lists, price structure, and dealings with a common customer"); *DDS, Inc. v. Lucas Aero. Power Transmission Corp.*, 182 F.R.D. 1 (N.D.N.Y.1998) (protecting trade secrets of manufacturing process and customer lists, and breakdown of annual sales figures).

### 3. Umbrella Protective Orders

■ In large complex cases, courts often enter "umbrella" protective orders, which permit parties to designate in advance a large volume of discovery material as confidential. *See* Campbell, *Protective Order, supra* at 777–79 ("The use of umbrella orders in complex litigation has become commonplace."); *Pansy*, 23 F.3d at 787 n. 17 ("[B]ecause of the benefits of umbrella protective orders in cases involving large-scale discovery, the court may construct a broad umbrella protective order upon a threshold showing by the movant of good cause."). Parties are permitted to challenge that designation, and the burden of establishing that there is good cause to protect the designated materials rests at all times with the party seeking protection.

In complicated mass cases the use of umbrella protective orders is recommended by the Manual for Complex Litigation:

> When the volume of potentially protected materials is large, an umbrella order will expedite production, reduce costs, and avoid the burden on the court of document-by-document adjudication. Umbrella orders provide that all assertedly confidential material disclosed (and appropriately identified, usually by a stamp) is presumptively protected unless challenged. Such orders typically are made without a particularized showing to support the claim for protection, but such a showing must be made when-

ever a claim under an order is challenged.

Manual for Complex Litigation, § 11.423 (4th ed.2004).

The value of umbrella orders has been well-documented:

> [T]he propriety and desirability of protective orders securing the confidentiality of documents containing sensitive commercial information that are the subject of discovery in complex cases is too well established to belabor.... We are unaware of any case in the past half-dozen years of even a modicum of complexity where an umbrella protective order ... has not been agreed to by the parties and approved by the court.

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F.Supp. 866, 889 (E.D.Pa. 1981). See also 8 Wright & Miller at § 2035.

### 4. First Amendment Implications of Protective Orders

The leading Supreme Court case addressing the question of how the First Amendment's protection of speech applies to protective orders is *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *see also* Part III.D.4, *infra.* During discovery in a state court action against a newspaper for defamation, the defendant requested the production of documents relating to the financial affairs of the plaintiff and his religious organization. *Id.* at 23–25, 104 S.Ct. 2199. Plaintiffs sought a protective order for the financial documents to limit their publication and dissemination by the newspaper. *Id.* at 25, 104 S.Ct. 2199.

The trial court entered a protective order prohibiting defendant "from publishing, disseminating, or using the information [produced by plaintiffs] in any way except where necessary to prepare for and try the case." *Id.* at 27, 104 S.Ct. 2199.

Upholding the order, the Supreme Court of Washington declared: "the information to be discovered concerned the financial affairs of the plaintiff ... in which he and his associates had a recognizable privacy interest ... and the giving of publicity to these matters would allegedly and understandably result in annoyance, embarrassment and even oppression." *Id.* at 28, 104 S.Ct. 2199 (quotation and citation omitted).

In an appeal to the United States Supreme Court, the Seattle Times argued that the protective order contravened rights under the First Amendment:

> Petitioners argue that the First Amendment imposes strict limits on the availability of any judicial order that has the effect of restricting expression. They contend that civil discovery is not different from other sources of information, and that therefore the information is 'protected speech' for First Amendment purposes. Petitioners assert the right in this case to disseminate any information gained through discovery.... They submit [that] [w]hen a protective order seeks to limit expression, it may do so only if the proponent shows a compelling government interest.

*Id.* at 30–31, 104 S.Ct. 2199 (quotation omitted). Responding, the Court acknowledged that most information obtained in civil discovery would rarely fall into the classes of speech unprotected by the First Amendment, such as obscenity, defamatory statements, threats, and the like. *Id.* at 31, 104 S.Ct. 2199. Yet, it wrote, it "does not necessarily follow ... that a litigant has an unrestrained right to disseminate information that has been obtained through pretrial discovery." *Id.*

Rejected by the unanimous Court was the contention that information obtained through civil discovery is no different from information obtained through other means:

> As in all civil litigation, petitioners gained the information they wish to dis-

seminate only by virtue of the trial court's discovery processes. As the Rules authorizing discovery were adopted by the state legislature, the processes thereunder are a matter of legislative grace. A litigant has no First Amendment right of access to information made available only for purposes of trying his suit.

*Id.* at 32, 104 S.Ct. 2199; see also *Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information.").

Protective orders prohibiting dissemination of materials discovered before trial are "not the kind of classic prior restraint that require[ ] exacting First Amendment scrutiny." *Seattle Times* at 33, 104 S.Ct. 2199. The type of restrictions deemed permissible are those that apply to information obtained through the civil discovery process. While parties may be restrained from disseminating information obtained through the discovery mechanism, they "may disseminate the identical information ... as long as the information is gained through means independent of the court's processes." *Id.* at 34, 104 S.Ct. 2199.

### C. Court Authority to Enforce Orders

#### 1. Generally

Courts have the inherent authority to enforce their orders. "[T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order." *In re Debs*, 158 U.S. 564, 594, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); see also *In re Lafayette Radio Elec. Corp.*, 761 F.2d 84, 93 (2d Cir.1985) ("ancillary jurisdiction is recognized as part of a court's inherent power to prevent its judgments and orders from being ignored or avoided with impunity"). The

power is a necessary prerequisite to the administration of justice; without it, courts would be ill-equipped to ensure the rule of law in a democratic society.

"It is one of the equitable powers, inherent in every court of justice so long as it retains control of the subject-matter and of the parties, to correct that which has been wrongfully done by virtue of its process." *See Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.,* 249 U.S. 134, 146, 39 S.Ct. 237, 63 L.Ed. 517 (1919); *see generally Anderson v. Dunn,* 19 U.S. 204, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose ... submission to their lawful mandates"); *In re Lafayette Radio,* 761 F.2d at 92 ("it is established that a federal court sitting in equity that has jurisdiction to issue a decree necessarily has ancillary and supplemental jurisdiction to enter orders and judgments designed to effectuate that decree").

### 2. National Scope

 The jurisdiction of a court to enforce its orders extends nationwide. "Nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order." *Waffenschmidt v. MacKay,* 763 F.2d 711, 714 (5th Cir.1985); *see also Stiller v. Hardman,* 324 F.2d 626, 628 (2d Cir.1963) ("Violation of an injunctive order is cognizable in the court which issued the injunction, regardless of where the violation occurred.").

### D. Injunctions

### 1. Generally

 The authority to issue injunctions is derived from the courts' inherent equity powers and Rule 65 of the Federal Rules of Civil Procedure. "In most cases the determination whether to issue an injunction involves a balancing of the interests of the parties who might be affected by the court's decision—the hardship on plaintiff if relief is denied as compared to the hardship to defendant if relief is granted." 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane at § 2942. Decision as to whether an injunction is warranted on the facts of a particular case is committed to the sound discretion of the trial court. *See id.; Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power").

At common law, chancery courts in England provided extraordinary relief such as injunctions and specific performance only when the parties could not obtain an effective remedy from the courts of law. 11A Wright & Miller at § 2944; McClintock, Equity, § 21 (2d ed.1948). "Even though there no longer are separate law and equity courts ... injunctive relief continues to be viewed as 'extraordinary' and courts are reluctant to award it if the claimant can secure adequate rectification of his grievance by an award of damages." *Id.*

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). "A plaintiff seeking an injunction must show that there is an imminent threat of harm and that the threatened harm is 'irreparable.'" Owen Fiss, Injunctions 59 (2d ed.1984).

### 2. Persons Bound

Rule 65(d) of the Federal Rules of Civil Procedure provides that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in

active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R.Civ.P. 65(d). The rule "is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them, or subject to their control. In essence it is that [persons bound] may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945). *See, e.g.,* 2 Wayne R. LaFave, Substantive Criminal Law, § 13.2(a) (2d ed.2003) (discussing criteria for aiding and abetting); *id.* § 13.2(b) at 344; 4 Wharton's Criminal Law § 685 (15th ed.1996) (same).

 "[A]n issue of privity in the context of determining who is bound by an injunction ... in a particular case is often not easy to resolve." 11A Wright & Miller at § 2956. A fact-sensitive inquiry must be undertaken to determine whether persons not named in an injunction can be bound by its terms because they are acting in concert with an enjoined party. *Id.; Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979) ("Whether one not named in an injunctive decree may nevertheless be bound by it depends on the facts of each case.").

 Those persons named in an injunction are considered "parties" for the purpose of Rule 65(d). *See Madsen v. Women's Health Ctr., Inc.* 512 U.S. 753, 775, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). The party seeking enforcement of an injunction against persons not named bears the burden of demonstrating that those persons are bound by the order. *See People of the State of N.Y. by Vacco v. Operation Rescue Nat'l,* 80 F.3d 64, 70 (2d Cir.1996).

### 3. Enjoining Dissemination of Stolen Protected Documents

 Recovering stolen documents obtained in violation of a court discovery order when needed to protect a party to a litigation is well within the equitable power of a federal district court. *See* 28 U.S.C. § 1651(a) (district courts "may issue all writs necessary or appropriate in aid of their ... jurisdiction and agreeable to the usages and principles of law"); *Egri v. Conn. Yankee Atomic Power Co.*, 68 Fed. Appx. 249, 255–56 (2d Cir.2003) (finding injunction enforcing protective order permissible under the All Writs Act) (unpublished opinion); Fed.R.Civ.P. 16(f) (failure to obey a pretrial order); *see generally* Part III.C, *supra.* Even if the order were improperly issued, it must be modified or overturned and not deliberately violated when in force. *See, e.g., Walker v. City of Birmingham*, 388 U.S. 307, 321, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) ("One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.").

The Supreme Court, in *Bartnicki v. Vopper*, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001), provided some guidance on the right to publish material of public significance illegally obtained by a third party. *See also* Part III.B.4, *supra,* on First Amendment implications of protective orders A cell phone conversation had been illegally intercepted by private parties in violation of a state wiretapping statute, and then turned over to a third person who published it. The third person was considered to be in legal possession of the recorded conversation.

The Court held unconstitutional as applied state legislation prohibiting intentional disclosure of the illegally intercepted

communication by the third person. The majority emphasized its reluctance to definitively answer "the question whether, in cases where information has been acquired *unlawfully* by a newspaper ... government may ever punish not only the unlawful acquisition, but the ensuing publication as well." *Id.* at 528–29, 121 S.Ct. 1753 (internal quotation and citation omitted) (emphasis in original). It listed some of the criteria it weighed in deciding to protect the third party's publication: First, the third party played no part in the illegal interception, but found out about it "only after it occurred." *Id.* at 525, 121 S.Ct. 1753. Second, access to the information was "lawfully" obtained by the third party even though the information itself was "unlawfully" obtained by another. *Id.* Third, the subject matter was a matter of public concern.

### 4. Content Neutral

Supporting the power to prevent publication in *Bartnicki* was the injunction's "content neutral" form. *Id.* at 525–29, 121 S.Ct. 1753.

■ Applicability of the First Amendment to an injunction generally depends upon whether any restriction on speech it contains is "content-based" or "content-neutral." *See Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 450 (2d Cir.2001). In an assessment of content-neutrality, "[t]he government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see also R.A.V. v. St. Paul,* 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("The government may not regulate [speech] based on hostility—or favorit-ism—towards the underlying message expressed.").

The Court of Appeals for the Second Circuit has defined as content-neutral those regulations that do "not depend on the nature or content of the idea that [a person] wishes to express but only on the materials that would be the medium of expression." *Lindsey v. Bloomberg,* 476 F.3d 74, 84 (2d Cir.2007); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech.") (emphasis and internal quotation marks omitted).

■ Injunctions "issued not because of the content of petitioners' expression ... but because of ... prior unlawful conduct" are content neutral. *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 764–65, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Content neutral injunctions must "burden no more speech than necessary to serve a significant government interest," *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516, but they are not required to "employ the least restrictive means of accomplishing the governmental objective." *Universal City Studios,* 273 F.3d at 455. Because such injunctions do not enjoin speech based on its content, they do "not arouse the fears that trigger the application of constitutional 'prior restraint' principles." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979).

"The First Amendment does not prohibit courts from incidentally enjoining speech in order to protect a legitimate property right." *DVD Copy Control Ass'n Inc. v. Bunner,* 31 Cal.4th 864, 881, 4 Cal.Rptr.3d 69, 75 P.3d 1; *see also Dallas Cowboys,* 604 F.2d at 206 ("This is not a case of government censorship, but a private

plaintiff's attempt to protect its property rights."). "The mere fact that [one] claims an expressive … purpose … does not give [one] a right, under the First Amendment to the United States Constitution, to appropriate to [oneself] the harvest of those who have sown." *San Francisco Arts & Ath., Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 526, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (quotation and citation omitted).

### IV. Application of Law to Facts

A. *The Documents are Properly Protected Under CMO–3*

1. *CMO–3 is a Valid Umbrella Protective Order*

■ CMO–3 is an umbrella protective order which permits parties to designate as confidential materials that they "in good faith believe[ ][are] properly protected under Federal Rule of Civil Procedure 26(c)(7)." CMO–3 at ¶ 3. The designation of a document as "confidential" can be challenged by an opposing party, or any aggrieved entity, and the burden of establishing confidentiality rests on the producing party. *Id.* at ¶ 9. The use of such umbrella orders, which allow parties to designate substantial volumes of discovery materials as confidential upon a threshold showing of good cause, is permitted in large complex litigations, such as the instant multidistrict litigation consisting of thousands of cases. *See* Manual for Complex Litigation, § 11.423; *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 787 n. 17 (3d Cir.1994); Part III.B.3, *supra.*

2. *Documents Contain Information Protectable by CMO–3 and Rule 26(c)*

■ The sealed documents disseminated by Gottstein and his co-conspirators consist entirely of materials that were exchanged by the parties in the discovery phase of this litigation. For purposes of the presumption to public access, they play no role in the adjudication process. *See United States v. Amodeo,* 71 F.3d 1044, 1050 (2d Cir.1995); *F.T.C. v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 409 (1st Cir.1987). See Part III.A, supra.

This case is distinguishable from *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219 (6th Cir.1996), relied upon by respondents. In *Procter & Gamble,* an injunction prohibiting publication of "standard litigation filings"—consisting of a memorandum of law, complaint, and case statement—, rather than documents produced in discovery and not relied upon by the court, was overturned. *Procter & Gamble* at 222, 225.

In this litigation, a substantial amount of sensitive material, including medical records and trade and proprietary information, has been produced for discovery purposes in accordance with Rule 26(b)(1)'s relatively low threshold of relevance to any claim or defense. *See* Part III.B.1, *supra.* Such information is not generally appropriate for public consumption. The court entered its protective order covering confidential materials under both its general equitable powers and the authority granted by Rule 26(c). The order was essential to protecting litigants from the embarrassment and oppression that would result from unnecessary pretrial public disclosure of their private information.

The court's review of a sample of the documents disseminated by the conspirators in violation of CMO–3 as well as the articles in the New York Times provide clear and convincing evidence that they contain information properly protected as confidential under Rule 26(c). *See* Part II.H.2, *supra.* They consist mainly of trade secrets and confidential commercial information of defendant Lilly; revelation has the potential to impinge on the company's privacy and property rights and inflict

commercial harm. *See* Fed.R.Civ.P. 26(c)(7) (permitting protective orders that seal "trade secret or other confidential information"); *Cumberland Packing Corp. v. Monsanto Co.*, 184 F.R.D. 504, 506 (E.D.N.Y.1999) ("Documents falling into categories commonly sealed are those containing trade secrets, confidential research and development information, marketing plans, revenue information, pricing information, and the like."); see, e.g., *Gelb v. American Tel. & Tel. Co.*, 813 F.Supp. 1022, 1035 (S.D.N.Y.1993) (sealing internal documents which "constitute potential negative publicity about [defendant's] marketing tactics" because of "their potential to do commercial harm").

Any person, whether or not a party to this litigation, who believes documents designated as confidential under CMO–3 have been improperly sealed or should be disclosed in the public interest may take advantage of the order's declassification provisions and petition the court for declassification of certain documents. *See* CMO–3 at ¶ 9; *see also id.* at ¶ 16("Nothing in this Order shall prevent any party or other person from seeking modification of this Order or from objecting to discovery that it believes to be otherwise improper.").

### B. Court has the Power to Order Return of Stolen Documents

■ A large number of documents sealed by the court have been obtained illegally by the conspirators and those to whom they sent the documents. *See* Part II.H, *supra*. These confidential documents were procured solely by use of the court's discovery process; there has been no suggestion that anyone was able to retrieve them from any other source before revelation by the three conspirators—Berenson, Egilman, and Gottstein. *See Int'l Prods. Corp. v. Koons*, 325 F.2d 403, 407–08 (2d Cir.1963).

As in all civil litigation, [respondents] gained the information they wish to disseminate only by virtue of the trial court's discovery processes. As the Rules authorizing discovery were adopted by the [federal] legislature, the processes thereunder are a matter of legislative grace. A litigant has no First Amendment right of access to information made available only for purposes of trying his suit.

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32, 104 S.Ct. 2199, 81 L.Ed.2d 17(1984). Respondents here have no right to possession of the confidential documents given to them by the conspirators. Cf. Restatement (First) of Torts § 757, Liability for Disclosure or Use of Another's Trade Secret (1939; current through Sept. 2006) ("One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if (a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or (c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other ..."); *Conmar Prods. Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 155–56 (2d Cir.1949).

"It is one of the equitable powers, inherent in every court of justice so long as it retains control of the subject matter and of the parties, to correct that which has been wrongfully done by virtue of its process." *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145–46, 39 S.Ct. 237, 63 L.Ed. 517 (1919). This power encompasses the authority to order the return of the documents stolen by the conspirators in violation of the protective order. *See generally Anderson v. Dunn*, 19 U.S. 204, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821)

("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose ... submission to their lawful mandates."); *In re Lafayette Radio Elec. Corp.*, 761 F.2d 84, 92 (2d Cir.1985) ("it is established that a federal court sitting in equity that has jurisdiction to issue a decree necessarily has ancillary and supplemental jurisdiction to enter orders and judgments designed to effectuate that decree"); *see also Egri v. Conn. Yankee Atomic Power Co.*, 68 Fed.Appx. 249, 255–56 (2d Cir.2003) ("Pursuant to the All Writs Act, a district court is authorized to bind non-parties where such action is necessary to preserve its ability to adjudicate proceedings already before it or to enforce its own prior decisions.") (unpublished opinion).

### C. Restrictions on Dissemination Do Not Violate First Amendment Rights

#### 1. CMO–3's Restriction on Dissemination of Confidential Documents Does Not Implicate First Amendment Rights

 CMO–3's restriction on dissemination of confidential materials produced in discovery does not implicate the parties' freedom of speech; "[a] litigant has no First Amendment right of access to information made available only for purposes of trying his suit." *Id.* at 32. Litigants do not have "an unrestrained right to disseminate information that has been obtained through pretrial discovery." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

 Nonparties who are prohibited from accessing confidential documents by CMO–3 cannot claim an infringement on their freedom of speech: "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *see*

*also Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982) ("Discovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public."). Those who can demonstrate a substantial need to know information contained in confidential documents must utilize CMO–3's declassification provisions. *See* CMO–3 at ¶ 9; *see also In re Agent Orange Prod. Liab. Litig.*, 104 F.R.D. 559, 572 (E.D.N.Y.1985) (declassifying documents upon a showing "that the need for disclosure outweighs the need for further protection"), *aff'd* 821 F.2d 139 (2d Cir.1987).

#### 2. The Injunction's Restriction on Dissemination Does Not Impinge on First Amendment Rights

 The instant injunction prohibiting further dissemination of confidential documents is content neutral. Its restriction does "not depend on the nature of the content of the idea that [the enjoined individuals wish] to express but only on the materials that would be the medium of expression." *Lindsey v. Bloomberg*, 476 F.3d at 84–85 (2d Cir.2007). The injunction is justified not by reference to the content of the covered documents, but rather by their unlawful acquisition. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764–65, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (holding injunctions "issued not because of the content of petitioners' expression ... but because of their prior unlawful conduct" are content neutral).

Only a minimal burden on speech results from the instant injunction since it restricts dissemination of documents only if those documents were obtained in the first instance by use of the court's processes. It does not restrict anyone from discussing any topic or publishing or expressing any opinion. It is content neutral and does not

"burden ... speech [more] than necessary to serve a significant government interest." *Madsen* at 765, 114 S.Ct. 2516. While the court is not required to "employ the least restrictive means of accomplishing the governmental objective," the injunction here is the least restrictive practicable method available to protect Lilly, the plaintiffs, and the court. *Universal City Studios, Inc., v. Corley,* 273 F.3d 429, 455 (2d Cir.2001).

Several important governmental interests are served by this injunction. It allows the court to protect the privacy and property rights of litigants appearing before it, which is essential to a fair and efficient system of adjudication. By prohibiting dissemination in violation of the court order the court's ability to enforce its own orders is preserved. Many of the protected documents contain trade secrets and commercial information, whose privacy the government has a stake in maintaining: "Trade secret law promotes the sharing of knowledge and the efficient operation of industry." *See DVD Copy Control Ass'n v. Bunner,* 31 Cal.4th 864, 878, 4 Cal.Rptr.3d 69, 75 P.3d 1 (Cal.2003) (discussing "governmental purpose behind protecting trade secrets").

Respondents' claims that the injunction represents an impermissible prior restraint are without merit. Content neutral injunctions such as the present one do "not arouse the fears that trigger the application of constitutional prior restraint principles." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979).

The instant case is readily distinguishable the Sixth Circuit Court of Appeals' decision primarily relied upon by respondents, *Procter & Gamble v. Bankers Trust, supra.* In *Procter & Gamble,* the court held an injunction prohibiting a news magazine from publishing litigation filings that had been improperly sealed in the first instance to be an impermissible infringement upon First Amendment rights. *Procter & Gamble,* 78 F.3d at 225. Here, the documents at issue are not litigation filings, but documents produced in discovery, to which the right of public access has not attached. *See* Parts III.A and IV.A, *supra; Procter & Gamble,* 78 F.3d at 225 ("the documents in question are standard litigation filings"). The documents were never unsealed under CMO–3, unlike the filings at issue in *Procter & Gamble,* which were unsealed at the time the district court granted the injunction. *See* Parts II.H.2 and IV.A, *supra; Procter & Gamble,* 78 F.3d at 223, 223 ("the District Court determined that, because the parties could not provide a substantial government interest in keeping the documents confidential, the sealed documents should no longer be protected and should be released into the public domain") (quotation marks omitted). Finally, the enjoined party in *Procter & Gamble* was a member of the media, Business Week magazine. *See id.* at 225. (describing the overturned injunction as part of "a practice that, under all but the most exceptional circumstances, violates the Constitution: preventing a *news organization* from publishing information in its possession on a *matter of public concern*") (emphasis supplied). The enjoined persons here are private, nonmedia-connected individuals.

The injunction here is content neutral, places only a minimal burden on speech, and serves significant government interests. It does not restrict freedom of speech under the First Amendment.

*D. Enjoining Persons Who Refuse to Return the Documents is Necessary to Prevent Irreparable Harm to Lilly*

 Disclosure of confidential proprietary material and trade secrets poses a

significant risk of harm to Lilly, a pharmaceutical company operating in a competitive marketplace. Both Lilly's competitors' and detractors' use of the materials has the potential to inflict severe commercial harm on the company. *See* Dec'l of Gerald Hoffman, ¶ 18 ("If Lilly's internal documents were to be publicly disseminated, every pharmaceutical company in the world, including competitors to all of Lilly's marketed medications, including Zyprexa, would have access to a treasure trove of competitive intelligence, in an organized and assembled manner."). The disclosure of its trade secrets can be considered tantamount to appropriation of the company's property. *See, e.g., Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 155 (2d Cir.1949) (finding trade secrets to be property).

The harm faced by Lilly is amplified by the fact that the protected documents which respondents seek to disseminate are segments of a large body of information, whose selective and out-of-context disclosure may lead to confusion in the patient community and undeserved reputational harm—"what appears damning may, in context after difficult proof, be shown to be neutral or even favorable to the defendant." Note, *Secrecy in Civil Trials: Some Tentative Views*, 9 J.L. & Pol'y 53, 58 (2000).

In granting this injunction, the court has balanced the harm to petitioner if relief is denied against the harm to respondents if relief is granted. *See generally* 11A Wright & Miller at § 2942. The harm imposed by the injunction on respondents is minimal. They are required to return stolen documents over which they enjoy no property rights. *See* Part IV.B, *supra*. Their freedom of speech is not impinged upon. *See* Part IV.C, *supra*. To the extent they believe access to the protected documents is essential to their pursuit of the public interest, they may petition the court for declassification of the documents or modification of the protective order. *See* Part IV.C.1, *supra; see also Walker v. City of Birmingham*, 388 U.S. 307, 321, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) ("One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.").

Some of the individuals who have thus far refused to comply with requests to return the stolen documents have shown a resolute desire to flout court orders and inflict economic and reputational harm on Lilly. If not enjoined, it is highly probable that these individuals will widely disseminate the documents they know to be protected by a court order, in a form unnecessarily damaging to Lilly. *See, e.g.*, Tr. at 48–49, 193–94; Part II.K.4, *supra*. The injunction against them is therefore necessary to prevent irreparable harm to Lilly.

*E. Enjoining Persons Who Returned the Documents is Not Necessary to Prevent Irreparable Harm to Lilly*

 As discussed *supra* in Part IV.D, dissemination of its confidential documents poses a significant risk of harm to Lilly's privacy, proprietary, and commercial interests. Nonetheless, those individuals who have returned the documents they received from the conspirators, and who have not themselves been implicated in the conspiracy, are unlikely to cause harm to Lilly.

 It is not necessary in this case to burden respondents who have demonstrated compliance with and respect for court orders in order to prevent future harm to Lilly. An injunction should be no more burdensome to respondents than necessary to provide complete relief to petitioner. *See Califano v. Yamasaki*, 442 U.S.

682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). No individual who has returned the documents, and is not a member of the conspiracy to illegally procure the documents, is enjoined.

### F. Websites Should Not Be Enjoined

■ A difficult issue is presented by Lilly's request to enjoin certain websites from posting the confidential documents. See Part I, supra. The websites in question had posted or linked to the documents prior to being enjoined from doing so by the preliminary injunction of January 4, 2007. No site has violated the January 4th order.

A user of one of the enjoined websites, "John Doe", has appeared in this action to contest the injunction's applicability to him. The injunction has no application to him since he apparently received no documents from the conspirators.

Prohibiting five of the internet's millions of websites from posting the documents will not substantially lower the risk of harm posed to Lilly. Websites are primarily fora for speech. Limiting the fora available to would-be disseminators by such an infinitesimal percentage would be a fruitless exercise of the court's equitable power. A more effective use of the court's equitable discretion is to impose restraints on the individuals who pose the greatest risk of harm to Lilly—those who have not returned the documents despite knowledge that they were illegally procured. See Part IV.D, supra.

■ Mindful of the role of the internet as a major modern tool of free speech, see Part I supra, in the exercise of discretion the court refrains from permanently enjoining websites based on the insubstantial evidence of risk of irreparable harm. Restrictions on speech, even in the context of content-neutrality, should be avoided if not essential to promoting an important government interest. No website is enjoined from disseminating documents.

### G. All Named Persons are Bound by the Injunction

The court's power is being exercised to enjoin all persons whose conduct poses a significant risk of irreparable harm to Lilly which cannot be remedied except by injunction. See Part III.D, supra; Note, Developments in the Law: Injunctions, 78 Harv. L.Rev. 994 (1965).

Respondents place great emphasis on Judge Hand's statement in Alemite Mfg. Corp. v. Staff, 42 F.2d 832 (2d Cir.1930), that "the only occasion when a person not a party may be punished, is when he has helped bring about ... an act of a party [in violation of a prior court decree]." Id. at 832–33 (emphasis supplied). In Alemite, the Court of Appeals for the Second Circuit was considering an appeal from a conviction of contempt by an individual whose alleged violation of an injunction in which he had not been named formed the basis of the contempt proceeding. Id. at 832.

Alemite speaks to the question of who may be held in contempt for violating an injunction. See Developments in the Law: Injunctions, supra, at 1028–29. It does not bear on the question presented in this case of who the court may enjoin by name in the first instance. Unlike Alemite, this is not a contempt proceeding, and the court is not now punishing anyone for any alleged violation of court orders. Rather, this proceeding seeks to prevent irreparable harm to Lilly by enjoining those persons whose actions threaten such harm. See Owen Fiss, Injunctions, 109 (2d ed. 1984) ("The traditional office of an injunction is to prevent harm."). The relief granted is not punitive, but preventative. See generally Part III.D.1, supra.

The necessity of enjoining dissemination and requiring return of the sealed documents is not limited to those who were bound by the terms of CMO–3. The power to enjoin extends to persons and organizations whose activities present a risk of irreparable harm to petitioner that can not be alleviated by means other than injunction.

The parties to these injunction proceedings are the petitioner, Eli Lilly, and respondents, including James Gottstein, David Egilman, Dr. David Cohen, Judi Chamberlin, Vera Sharav, Robert Whitaker, Eric Whalen, and David Oaks. *See* Civil Docket for Case No. 1:07–CV00504–JBW–RLM. Even if the injunction proceedings are considered part of the more general series of actions, 04–MDL–01596, the respondents who are bound by this order have either been served or have appeared and should return documents illegally obtained that are in their possession. They cannot claim to be bona fide purchasers. *See* Part IV.B, *supra.*

The injunction issued here is binding on all persons named within it as well as "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R.Civ.P. 65(d). *See, e.g., Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979) ("Whether one *not named* in an injunctive decree may nevertheless be bound by it is governed by Rule 65(d).") (emphasis supplied).

### H. Persons Bound

#### 1. Recipients of Documents

Persons who received documents from Gottstein, but against whom Lilly is not seeking a permanent injunction, are: Alex Berenson (of The New York Times); Snighdha Prakash (of National Public Radio), Amelia Desanto, Steve Cha, Jerry Winchester, Dr. Grace Jackson, the Alliance for Human Research Protection, and MindFreedom International.

Persons and websites against whom Lilly seeks a permanent injunction are: Dr. Peter Breggin, Judi Chamberlin, Dr. David Cohen, Terri Gottstein, Will Hall, David Oaks, Vera Sharav, Eric Whalen, Robert Whitaker, Bruce Whittington, Laura Ziegler, zyprexa.pbwiki.com, www.mindfreedom.org, www.ahrp.org, www.ahrp.blogspot.org, and www.joysoup.net. The individuals named received the documents, but proof that the websites received the documents is lacking.

Persons who have returned the documents and need not be enjoined are: Dr. Peter Breggin, Steve Cha, Terri Gottstein, Will Hall, Dr. Grace Jackson, Dr. Stephen Kruszewski, Bruce Whittington, Jerry Winchester, and Laura Ziegler.

Persons who the evidence demonstrates received, but have not returned, the documents, and against whom Lilly is seeking a final injunction, are: Judi Chamberlin, Dr. David Cohen, David Oaks, Vera Sharav, Eric Whalen, and Robert Whitaker.

#### 2. Amelia Desanto

Documents provided by Gottstein to Senate staffer Amelia Desanto have not been returned. Lilly has not sought an injunction against Desanto. Accordingly, and in light of the comity and respect due a coequal branch of government, Desanto is not enjoined.

#### 3. N.Y. Times, National Public Radio, and Snighdha Prakash

No injunction has been sought against the New York Times. No showing has been made that any of its employees other than Berenson possessed the documents. No showing has been made that the Times knew they had been stolen. The reason-

ing applicable to the New York Times applies to National Public Radio.

Snighdha Prakash of National Public Radio is not enjoined because no injunction against her is sought. The New York Times and National Public Radio are not enjoined.

### 4. Berenson

While Berenson's conduct in assisting in the stealing of the protected documents was reprehensible, Lilly has sought no injunction against him. Accordingly, Berenson is not enjoined.

### 5. Gottstein and Egilman

Gottstein and Egilman have appeared by counsel in these proceedings and are therefore bound. *See* Tr. at 243, 252. Since their irresponsible conduct suggests further restraints to protect the parties and the court, they are included in this injunction.

### 6. Websites

For the reasons stated in Parts I and IV.F, *supra*, it is unlikely that the court can now effectively enforce an injunction against the internet in its various manifestations, and it would constitute a dubious manifestation of public policy were it to attempt to do so. No internet site is enjoined.

### 7. Persons Who Have Not Returned the Documents

The following individuals have been asked to return the documents they received from Gottstein to the Special Master, but have thus far failed to do so: Dr. David Cohen, Judi Chamberlin, Vera Sharav, Robert Whitaker and Eric Whalen. David Oaks is highly likely to have in his possession copies of the documents that he received directly or indirectly from Gottstein, but he has not returned them. All persons listed in this paragraph are being ordered to return any copies of the documents in their possession to the Special Master immediately. *Se* e Part VIII, *infra.*

The attorney for Vera Sharav, who is holding her copies of the documents, is considered to hold them on behalf of Ms. Sharav. He is bound to return them on her behalf.

Berenson, Snighdha Prakash and Amelia Desanto have also not returned the documents. The application of this order to Berenson is discussed in Part IV.H.4, *supra;* the application of this order to Snighdha Prakash is discussed in Part IV.H.3, *supra;* the application of this order to Amelia Desanto is discussed in Part IV.H.2, *supra.*

### 8. Persons Restrained

Berenson's, Egilman's, and Gottstein's brazen flouting of this court's protective order raises serious questions about their responsibility. The court, based on the evidence before it, is not satisfied that they can be counted on to return all copies of the documents they may have in their possession or control. Egilman and Gottstein are therefore being permanently enjoined as noted in Part IV.H.5, *supra.* Berenson is not being enjoined since no injunction against him has been sought by Lilly. *See* Part IV.H.4, *supra.*

Those individuals who received documents and from whom Lilly seeks return but who have not returned them are ordered to return them. *See* Part IV.B.7, *supra.* Their disregard for the court's processes poses a significant risk of irreparable harm to Lilly of further dissemination by them of protected documents. They are enjoined from further attempts at dissemination. *See* Part VIII, *infra.*

## V. Findings of Fact and Law

### A. Embodied in this Memorandum

This Memorandum and Order contains at various points the court's findings of fact and law. *See, e.g.,* findings in Parts II and IV, *supra; see also* Fed.R.Civ.P. 65(d) ("Every order granting an injunction ... shall set forth the reasons for its issuance"); Fed R. Civ. P. 52(a).

Petitioner and respondents have submitted extensive formal findings of fact and law. The court sees no need to adopt them in view of this comprehensive memorandum.

### B. Irreparable Harm to Lilly

Publication of the protected documents has already created irreparable harm to Lilly by revealing its trade secrets, confidential preliminary research, and merchandising techniques. It has made settlement of the remaining MDL and state cases and trials more difficult by creating probable prejudice largely irrelevant to the issues posed by the pending cases and by making impartial juror selection more difficult. It may have adversely affected prospective plaintiffs who may be less willing to sue if their intimate medical problems can be revealed through violation of the court's protective orders. And, of course, flouting the court's orders weakens the judicial structure.

As noted in Part IV.D, *supra,* there remains the substantial probability of further abuse of CMO–3 by the conspirators and individuals who have not returned the protected documents. This danger constitutes a continuous overhanging threat of harm which is likely to affect Lilly's standing in the marketplace and the value of the corporation as a whole.

There has already been sufficient revelation in the New York Times so that if Congress, the Food and Drug Administration, or the Federal Trade Commission wish to investigate or act they have grounds for doing so, subpoenaing protected documents as necessary for their purposes.

### C. Lack of Appreciable Harm to Those Bound

There is little or no harm to anyone bound by the injunction. None are harmed in their private person. To the extent that they wish to protect the public welfare by their revelation of protected documents, CMO–3 provides a vehicle for doing so. *See* Part IV.D, *supra.*

### D. Conclusion

The balance of benefits and harms leads overwhelmingly to support of the injunction now being issued. *See* Part IV.D, *supra.*

## VI. Conclusion

The preliminary injunction was justified. The references and restrictions upon various sites on the internet are not carried over to the final injunction in the exercise of discretion.

## VII. Stay

This final judgment and injunction is stayed for ten days to permit an application to the Court of Appeals of the Second Circuit for reinstatement of this court's order of January 4, 2007 including within a preliminary injunction various websites, or for other relief. The preliminary injunction shall remain in effect for ten days.

## VIII. Injunction

It is hereby

ORDERED that the following individuals who have received documents produced by Eli Lilly and Company subject to CMO–3 (including all copies of any electronic documents, hard copy documents

and CDs/DVDs) are enjoined from further disseminating these documents: Judi Chamberlin, Dr. David Cohen, David Egilman, James Gottstein, David Oaks, Vera Sharav, Eric Whalen, and Robert Whitaker. He or she shall forthwith return any such documents and copies still in his or her possession or control to Peter Woodin, Special Master for Discovery, at JAMS, 280 Park Avenue, West Building, 28th Floor, New York, N.Y. 10017.

SO ORDERED.